## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

**SAMUEL BARKER**                                    **CIVIL ACTION**

**VERSUS**                                                  **NO. 21-1997**

**DARREL VANNOY, WARDEN**                     **SECTION: "E"(3)**

### REPORT AND RECOMMENDATION

Petitioner, Samuel Barker, a Louisiana state prisoner, filed the instant federal application seeking habeas corpus relief pursuant to 28 U.S.C. § 2254. For the following reasons, it is recommended that the application be **DISMISSED WITH PREJUDICE**.

On August 7, 2015, petitioner was charged by Bill of Information with nine offenses, consisting of seven felonies and two misdemeanors. On direct appeal, those charges were summarized as follows:

- Count 1: simple burglary of a structure ("3207 Dublin Street, belonging to Golean's Reception Hall"; hereafter referred to as "Golean's") occurring on June 15, 2015;

- Count 2: possession of burglary tools ("a screwdriver and/or a claw type hammer and/or channel lock pliers and/or needle nose pliers") occurring on June 14, 2015;

- Count 3: simple criminal damage to property (a television and/or D.J. equipment and/or a wall belonging to Golean's), where the damage amounted to more than $500.00 and less than $50,000.00 occurring on June 14, 2015;

- Count 4: simple burglary of a shed (located at 1116 Napoleon Avenue) occurring on June 9, 2015;

- Count 5: theft of a computer valued at $750.00 or more but less than $1500.00 (belonging to Yolanda Parker) with the intent to permanently deprive Yolanda Parker of it occurring on June 9, 2015;

- Count 6: theft of a computer valued at $750.00 or more but less than $1500.00 (belonging to Notre Dame Seminary) with the intent to permanently deprive Notre Dame Seminary of it occurring on June 13, 2015;

- Count 7: simple criminal damage to property (a table belonging to Notre Dame Seminary) with damage amounting to less than $500.00 occurring on June 13, 2015;

- Count 8: attempted simple burglary of an inhabited dwelling (located at 8203 Oleander Street) occurring on June 14, 2015;

- Count 9: attempted simple burglary of an inhabited dwelling (located at 8201 Oleander Street) occurring on June 14, 2015.[1]

A trial was held in November of 2016, with a jury as the trier of fact as to the felony counts and with the judge as the trier of fact as to the misdemeanor counts. On November 9, 2016, the jury found petitioner guilty as charged on Counts 1, 3, 4, 5, 6, and 9, and guilty of the lesser misdemeanor offense of criminal trespass on Count 8.[2] The following day, the trial judge found him guilty as charged on Count 2 and not guilty on Count 7.[3]

Regarding his sentences, petitioner was originally sentenced as follows: twelve years on Counts 1 and 4; six months on Counts 2 and 8; two years on Count 3; ten years on Counts 5 and 6; and six years on Count 9.[4] However, he was subsequently charged as a habitual offender with respect to the felony convictions,[5] adjudicated a fourth felony offender, and resentenced as such as follows: life imprisonment without benefit of probation, parole, or suspension of sentence on

---

[1] State v. Barker, 317 So. 3d 422, 432-33 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21; see also State Rec., Vol. 2 of 21, Bill of Information.
[2] State Rec., Vol. 17 of 21, transcript of November 9, 2016, pp. 266-67; State Rec., Vol. 1 of 21, minute entry dated November 9, 2016.
[3] State Rec., Vol. 1 of 21, minute entry dated November 10, 2016.
[4] State Rec., Vol. 6 of 21, transcript of January 6, 2017; State Rec., Vol. 1 of 21, minute entry dated January 6, 2017.
[5] State Rec., Vol. 2 of 21, Multiple Bill of Information.

Counts 1 and 4; and twenty years imprisonment without benefit of probation, parole, or suspension of sentence on Counts 3, 5, 6, and 9.[6]

Petitioner appealed, and the Louisiana Fourth Circuit Court of Appeal affirmed his convictions and sentences.[7]  The Louisiana Supreme Court thereafter denied his related writ application.[8]

Before the proceedings on direct review had even concluded, petitioner began seeking collateral review.  Over the years, he filed numerous pleadings with the state district court seeking collateral review, all of which were denied.  Those included, but were not limited to,[9] the following:

- A "Motion for Correction of Premature, Infirm and Invalid Multiple Offender Sentence Based on Application of New Louisiana Supreme Court Ruling."[10]  After the state district court denied that motion,[11] petitioner's related writ applications were denied by the Louisiana Fourth Circuit Court of Appeal[12] and the Louisiana Supreme Court.[13]

---

[6] State Rec., Vol. 6 of 21, transcript of July 20, 2017; State Rec., Vol. 1 of 21, minute entry dated July 20, 2017.

[7] State v. Barker, 317 So. 3d 422 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.

[8] State v. Barker, 267 So. 3d 85 (La. 2019); State Rec., Vol. 21 of 21.  Petitioner also filed a related motion for reconsideration, which the Louisiana Supreme Court refused to consider, citing Louisiana Supreme Court Rule IX, § 6.  State v. Barker, 278 So. 3d 361 (La. 2019); State Rec., Vol. 21 of 21.

[9] Under federal law, claims are not generally deemed exhausted for federal purposes unless they have been fairly presented to **all three levels of the state court system**.  See Baldwin v. Reese, 541 U.S. 27, 29 (2004) (noting that, to comply with the exhaustion requirement, "the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review)").  Therefore, only the claims asserted in the collateral-review filings pursued all the way through the Louisiana Supreme Court are relevant to these proceedings, and so only those filings are recounted herein.

[10] State Rec., Vol. 21 of 21, "Motion for Correction of Premature, Infirm and Invalid Multiple Offender Sentence Based on Application of New Louisiana Supreme Court Ruling."

[11] State Rec., Vol. 21 of 21; Judgment dated July 13, 2018.

[12] State v. Barker, No. 2019-K-0027 (La. App. 4th Cir. Feb. 11, 2019); State Rec., Vol. 21 of 21.

[13] State v. Barker, 282 So. 3d 224 (La. 2019); State Rec., Vol. 21 of 21.

- Two motions to correct an illegal sentence. After the state district court denied those motions, petitioner's related writ applications were denied by the Louisiana Fourth Circuit Court of Appeal[14] and the Louisiana Supreme Court.[15]

- An application for post-conviction relief. After the state district court denied that application,[16] petitioner's related writ applications were denied by the Louisiana Fourth Circuit Court of Appeal[17] and the Louisiana Supreme Court.[18]

- An "Omnibus Motion Challenging Constitutionality of Statutory Provision and Illegal Sentence."[19] After the state district court denied that motion,[20] petitioner's related writ applications were denied by the Louisiana Fourth Circuit Court of Appeal[21] and the Louisiana Supreme Court.[22]

While those efforts in the state courts were still ongoing, petitioner also began seeking relief in this federal court. His first two federal petitions were dismissed without prejudice,[23] and it is his third petition that is presently pending before the Court.[24] The state filed a response

---

[14] State v. Barker, No. 2019-K-0669 (La. App. 4th Cir. Sept. 10, 2019); State Rec., Vol. 21 of 21.

[15] State v. Barker, 300 So. 3d 874 (La. 2020); State Rec., Vol. 21 of 21.

[16] State Rec., Vol. 21 of 21, Judgment dated February 10, 2020.

[17] State v. Barker, No. 2021-K-0161 (La. App. 4th Cir. Apr. 7, 2021); State Rec., Vol. 21 of 21.

[18] State v. Barker, 324 So. 3d 83 (La. 2021); State Rec., Vol. 21 of 21. Petitioner also filed a related motion for reconsideration, which the Louisiana Supreme Court refused to consider, citing Louisiana Supreme Court Rule IX, § 6. State v. Barker, 328 So. 3d 78 (La. 2021); State Rec., Vol. 21 of 21.

[19] State Rec., Vol. 21 of 21, "Omnibus Motion Challenging Constitutionality of Statutory Provision and Illegal Sentence."

[20] State Rec., Vol. 21 of 21, Judgment of June 22, 2021.

[21] State v. Barker, No. 2021-K-0472 (La. App. 4th Cir. Sept. 20, 2021); State Rec., Vol. 21 of 21.

[22] State v. Barker, 333 So. 3d 1248 (La. 2022).

[23] See Barker v. Vannoy, Civ. Action No. 17-6674 "E"(3), 2018 WL 2376362 (E.D. La. Apr. 2, 2018), adopted, 2018 WL 2364903 (E.D. La. May 24, 2018), reconsideration denied, 2018 WL 3023443 (E.D. La. June 18, 2018), appeal dismissed, No. 18-30846 (5th Cir. Dec. 20, 2018); Barker v. Vannoy, Civ. Action No. 18-11696, 2019 WL 2305263 "E"(3) (E.D. La. Mar. 8, 2019), adopted, 2019 WL 2303816 (E.D. La. May 30, 2019).

[24] Rec. Doc. 1.

conceding that the third petition is timely but arguing that all of petitioner's claims therein are either procedurally defaulted or meritless.[25]  Petitioner filed a reply to the state's response.[26]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002); accord Langley v. Prince, 926 F.3d 145, 155 (5th Cir. 2019) (noting that the AEDPA imposes a "relitigation bar" on claims adjudicated on the merits by the state court).  The applicable standards of review are now as follows.

As to pure questions of fact, factual findings are presumed to be correct and a federal court must give deference to the state court's decision unless it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the

---

[25] Rec. Doc. 24.
[26] Rec. Doc. 26.

Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning." Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases. A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (footnotes, internal quotation marks, ellipses, and brackets omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held: "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case." White v. Woodall, 572 U.S. 415, 426 (2014). However, a federal habeas court must be mindful that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694; accord Harrington v. Richter, 562 U.S. 86, 102-03 (2011) ("Section 2254(d) reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." (quotation marks omitted)); Langley, 926 F.3d at 156 ("The Supreme Court has repeatedly held that it is not enough to show the state court was wrong."); Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application

of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

Therefore:

> "[T]he [AEDPA's] relitigation bar forecloses relief unless the prisoner can show the state court was *so* wrong that the error was well understood and comprehended in existing law beyond any possibility for fairminded disagreement. In other words, the unreasonable-application exception asks whether it is beyond the realm of possibility that a fairminded jurist could agree with the state court.

Langley, 926 F.3d at 156 (citations and quotation marks omitted). "Under AEDPA's relitigation bar, the very existence of reasonable disagreement forecloses relief." Id. at 170.

> Further, the Supreme Court has expressly cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error. Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision. AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Woodall, 572 U.S. at 426 (citations and quotation marks omitted).

In summary, "AEDPA prevents defendants – **and federal courts** – from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Renico v. Lett, 559 U.S. 766, 779 (2010) (emphasis added). The Supreme Court has expressly warned that although "some federal judges find [28 U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law and apply the strictly deferential standards of review mandated therein. Woodall, 572 U.S. at 417.

## II. Petitioner's Claims

In his federal application, petitioner asserts numerous, often overlapping claims. To more accurately mirror the order in which they were addressed in the state courts, his claims will be

addressed herein in a different order than listed in the federal application. In addition, some of the interrelated and/or similar claims have been consolidated for discussion.

## A. Claims Challenging the Sufficiency of the Evidence

Petitioner claims that the evidence was insufficient to support his convictions.[27] However, in the state courts, he challenged the sufficiency of the evidence with respect to only some – but not all – of his convictions. Therefore, this Court will first address the sufficiency claims asserted in the state courts, and the Court will then address the remaining claims.

### 1. Counts 5, 6, and 9

On direct appeal, petitioner challenged the sufficiency of the evidence to convict him on Counts 5, 6, and 9. The Louisiana Fourth Circuit Court of Appeal found that the evidence was sufficient on those counts, holding:

> In his first assignment of error, Mr. Barker maintains that the evidence presented at trial was insufficient to support convictions for three counts: count 5 (theft of Yolanda Parker's computer), count 6 (theft of a computer from Notre Dame Seminary) and count 9 (attempted simple burglary of an inhabited dwelling located at 8201 Oleander Street). His argument centers on his contention that (a) no one testified who could place Mr. Barker in Ms. Parker's "office or in possession of Ms. Parker's computer;" (b) no one testified that Mr. Barker was seen in the vicinity of the area where the computer was taken at Notre Dame; and (c) no one testified to having seen Mr. Barker attempting to gain entry into the property on Oleander Street.
>
> This Court reiterated the applicable standard of review for sufficiency of the evidence challenges in State v. Rapp, 14-0633, pp. 5-6 (La. App. 4 Cir. 2/18/15), 161 So.3d 103, 108, quoting State v. Marcantel, 00-1629, p. 8 (La. 4/3/02), 815 So.2d 50, 55:
>
> > The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved the essential elements of the crime beyond a reasonable doubt. See LSA-C.Cr.P. art. 821; State v. Hampton, 98-

---

[27] Rec. Doc. 1-1, pp. 40-45.

0331, p. 13 (La. 4/23/99), 750 So.2d 867, 880, <u>cert. denied</u>, 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999).  Pursuant to <u>Jackson v. Virginia</u>, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the standard of review is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt.  Louisiana Revised Statute 15:438 provides that the fact finder, when analyzing circumstantial evidence, must be satisfied the overall evidence excludes every reasonable hypothesis of innocence.  <u>State v. Mitchell</u>, 99-3342, p. 7 (La. 10/17/00), 772 So.2d 78, 83.

Our jurisprudence also indicates that "[i]n the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion."  <u>State v. Williams</u>, 11-0414 p. 18 (La. App. 4 Cir. 2/29/12); 85 So.3d 759, 771.  Moreover, "[u]nder the <u>Jackson</u> standard, the rational credibility determinations of the trier of fact are not to be second guessed by a reviewing court" because "a factfinder's credibility determination is entitled to great weight and should not be disturbed unless it is contrary to the evidence."  <u>Id.</u>

With these principles in mind, we turn to the three convictions for which Mr. Barker, in his counseled brief, claims there was insufficient evidence to support his convictions.

## <u>Counts 5 and 6</u>

The crime of theft is defined by La. R.S. 14:67 (A) as follows:

Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations.   An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.

The following essential elements must be proven by the State:  "(1) that the defendant misappropriated or took by means of fraudulent conduct, practices, or representations; (2) a thing of value; (3) that belonged to another; and (4) that the defendant had the intent to deprive the owner permanently of that which was misappropriated or taken."  <u>State v. Biddy</u>, 13-0356, p. 12 (La. App. 4 Cir. 11/20/13), 129 So.3d 768, 776-77. (citation omitted).

### *Theft of Ms. Parker's computer*

Yolanda Parker, an administrative assistant and substitute teacher at Watson Memorial Teaching Ministries, whose duties included the welcoming of visitors to the ministry, testified regarding the theft of her computer on June 9, 2015.  According to Ms. Parker, the day of the theft was a Tuesday, a day on which the

ministry regularly hosted a bible study at 6:30 p.m. While preparations were taking place for the bible study and a meal following it, Ms. Parker saw an unfamiliar man and she invited him into her office (where her laptop computer, valued at between $800 and $900, was located). She asked him if he needed anything to which he replied that he needed food and money. Ms. Parker advised him that the ministry did not have any money, but she invited him to stay for bible study and the meal.

Feeling that this man had an "end game" and that he "looked like he was trying to get something," she escorted him out of her office and offered him a seat. In such a situation, "[w]hen [she] know[s] that somebody is playing games, [she would] get one of the elders of the church to come in." She then left for a short period (between five and fifteen minutes) and when she returned, both the man and her laptop computer were gone. The following day, Ms. Parker contacted the New Orleans Police Department. In a recorded 911 call which was played for the jury, Ms. Parker reported that her computer had been stolen and she gave a description of the man who had come to the ministry the previous day, who she suspected had stolen her computer. A detective came to the ministry and showed her a picture which she positively identified as the man who had been in her office on June 9.

While Ms. Parker testified that she did not actually see the man take her computer, she confirmed "that he was gone and [her] laptop was gone and he was near the vicinity of [her] property" during the time frame her computer disappeared. She likewise testified that she believed the man had taken her computer because "he wasn't in there for the right reasons," she suspected he was "looking to scam" and because she knew all of the fifteen to twenty regular attendees of the bible study. Moreover, as Ms. Parker was investigating her missing laptop, she learned that the man had approached the ministry earlier that day through the back door of the school's kitchen seeking food and "looking to take something else," which aroused her suspicions.

Tiffany Watson, a director at Watson Ministries, also testified about the events of June 9, 2015. That day, while she was taking out the trash from the kitchen, a man approached her and asked her for money. She advised him that she did not have any, but invited him to return that evening for bible study. The man left, and thirty minutes later, he returned and asked if he had left his wallet. He then asked if he could look around, and Ms. Watson advised that he could not and she did not allow him into the ministry.

Ms. Watson next saw the man later that evening around the time of the bible study. At that time, Mr. Barker was in the hallway, approximately six or seven feet from Ms. Parker's office. Later that evening, she learned that Ms. Parker's computer was missing when Ms. Parker asked if she had moved it. Both she and Ms. Parker searched for the computer but never located it. Ms. Watson concluded that the computer had to have been taken by the man she had seen twice that day after she checked to see that he had not gone to the bible study. She she [sic] testified that "he was really the only person that I figured would take it because we've never had those issues before." She indicated:

> I made an assumption that he took it based on, first of all, that morning coming back saying he left his wallet, that kind of triggered something, and then later when I saw him kind of perusing in the hall, and then did not see him after that 30 seconds or less of seeing him again, and then within minutes or so Yolanda's laptop is missing.  We have been there over 20 years and we are pretty sure that – I mean stuff just doesn't come up missing.[FN 6]

> [FN 6]  Ms. Watson, feeling responsible for the loss of Ms. Parker's computer (she testified that she "had let the guy in, got water, got familiar with him, I guess, invited him back, and then her property ended up missing"), replaced the computer at a cost of $800.

Ms. Watson later spoke to a police officer who showed her a picture and she identified that person as the man who she had seen that day.

Mr. Barker contends that, because the State presented neither fingerprint evidence nor eyewitness testimony of the theft, the State failed to prove his identity as the thief, asserting that anyone else in the building could have stolen the computer.  We find no merit to this argument.  When "circumstantial evidence forms the basis of a conviction, such evidence must consist of 'proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.'"  State v. Castro, 16-0284, p. 7 (La. App. 4 Cir. 12/14/16), 206 So.3d 1059, 1064, quoting State v. Shapiro, 431 So.2d 372, 378 (La. 1982).

Here, the computer was never recovered or located after it was discovered missing, and neither Ms. Parker nor Ms. Watson had moved, taken, or knew the location of the computer.  On this basis, reasonable jurors could have found that the computer had been taken, without Ms. Parker's consent, by someone without authority to possess it, who had the intent to deprive Ms. Parker of her computer permanently.

We further find that, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the State proved that it was Mr. Barker who had taken the computer.

Both Ms. Watson and Ms. Parker identified Mr. Barker as the man they had encountered at Watson Ministries from the photograph shown to them by a police officer.[FN 7]  Although neither witness had the opportunity to identify Mr. Barker during trial due to his earlier demand to exit the courtroom, the jurors viewed the same photograph the witnesses had seen and clearly made their own identification of him, as the jurors had seen Mr. Barker during voir dire and opening statement.[FN8]

> [FN 7]  As will be discussed *infra*, the photograph shown to both Ms. Parker and Ms. Watson was obtained by New Orleans Police Department ("NOPD") Detective Michael DiMarco, who investigated a "string of thefts and burglaries" in June, 2015.  The photograph was a still shot of Mr. Barker which was taken

from some surveillance video dated June 9, 2015 of property located at 1116 Napoleon Avenue (Count 4). We note that the surveillance video, itself, was shown to the jury.

[FN 8] The record reflects that Mr. Barker voluntarily absented himself from the trial. At the close of opening statements, Mr. Barker moved for a mistrial, which the trial court indicated was a violation of an in-chambers hearing at which Mr. Barker "acknowledged he understood" that, in order for him to act as "hybrid counsel" on his own behalf, he had "to remain within the confines of what he is legally entitled to do ..., that is, argue on his behalf as to the law and the evidence and facts and testimony that will be elicited during this case." The trial court then noted Mr. Barker had "forfeited [his] ability to proceed as hybrid counsel" and he would thereafter be represented by his trial counsel. After some discussion, Mr. Barker chose to remove himself from the courtroom. The trial court offered to allow him "to continue to listen to the proceedings against [him] in [the] law clerk's office, where there is a PA system, in the presence of a deputy and the law clerk so [he could] continue to at least hear what is happening in [the] proceedings." However, Mr. Barker declined this offer.

According to both Ms. Parker and Ms. Watson, Mr. Barker was the only person that evening who neither knew, and who could not be accounted for immediately following the theft. According to Ms. Watson's testimony, she had seen Mr. Barker alone in the hallway near Ms. Parker's office just before the bible study class began and within minutes of the theft. Similarly, Mr. Barker had been inside Ms. Parker's office and Ms. Parker left him alone while she went to find a church elder. Upon her return shortly thereafter, neither her computer nor Mr. Barker could be located. On this basis, the State presented sufficient evidence to support the jury's finding that Mr. Barker was the person who stole Ms. Parker's computer. It is clear that the jury rejected as unreasonable Mr. Barker's hypothesis that someone else had stolen the computer.

We also note that the jury watched the surveillance video of the property located at 1116 Napoleon Avenue (see footnote 6 [sic]), which showed Mr. Barker taking a piece of equipment from that residence, and also heard testimony about the theft of another computer from a religious establishment (discussed, *infra*), after Mr. Barker obtained entry under false pretenses and after having his request for money denied. While this other crimes evidence may not have been admissible to demonstrate Mr. Barker's bad character, it reasonably indicates Mr. Barker's identity as the perpetrator, his plan to gain entry onto private property, and his intent to commit a theft thereon. (La. C.E. art. 404 B(1)).[FN 9]

[FN 9] La. C.E. art. 404 (B)(1) provides, in pertinent part that "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident ...."

Thus, viewing the evidence in the light most favorable to the prosecution, we find the direct and circumstantial evidence adduced at trial to be sufficient for the jury's finding Mr. Barker guilty of the theft of Ms. Parker's computer.

### *Theft of the computer from Notre Dame Seminary*

Like his argument with respect to the theft of Ms. Parker's computer, Mr. Barker contends that, because the State presented neither fingerprint evidence nor eyewitness testimony of the theft, the State failed to prove his identity as the thief, asserting that anyone else in the building could have stolen the computer. We disagree. After reviewing the entirety of the record, as we found in Castro, 16-0284, p. 7, 206 So.3d at 1064, here, the State presented "proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." (internal quotation omitted).

The testimony adduced at trial reflects that on June 13, 2015, Jennifer Prather, a Notre Dame Seminary student, observed a man ringing the doorbell of the seminary while she was on her lunch break.[FN 10] She opened the door and the man advised that he was there to meet with Father (James) Warner. She advised the man that Father Warner was not present, to which the man responded that he was fifteen minutes early and that he would call Father Warner. She then left the man alone in the lobby as she had a class to attend. When shown video surveillance of the seminary during her testimony, Ms. Prather confirmed that it depicted the events of June 13, 2015 as well as the man she indicated had come to meet with Father Warner.

[FN 10] June 13, 2015 was a Saturday. According to Ms. Prather, who was pursuing a master's degree in theological studies, Notre Dame Seminary offers classes on Saturdays for working students.

Father Warner, who is the Director and President of the Notre Dame Seminary, testified that, on the morning of June 13, 2015, he was at a wedding. Upon his return from the wedding, he observed that a sealed door had been knocked over, the sheetrock wall had been "pushed in" between the mailroom and his secretary's office, and file cabinets and papers had been knocked down. There was debris on the floor and his secretary's office was disheveled.

The following Monday, it was discovered that a computer from one of the classrooms had been stolen; it had been chained to a table and it had been "cut and removed."[FN 11] Father Warner testified that the table to which the computer had been chained was located in the classroom nearest to his office.

[FN 11] The State introduced the computer sales receipt showing the cost was $1,235.88 at the time it was purchased.

Father Warner determined that the theft of the computer occurred between the time that he had left in the morning and his return to the seminary that afternoon, or a "six-, seven-hour window." When he returned to the seminary, no one was

present, as classes had already ended (there had only been the Saturday morning class). Father Warner testified that he had been at the seminary before he attended the wedding and nothing had been damaged. Importantly, he was not expecting any visitors to the seminary that day.

Father Warner and the director of the facility looked at surveillance video from that day, which was shown to the jury, and noted the man about whom Ms. Prather had testified. Father Warner was well familiar with the man, having encountered him on several occasions. According to Father Warner, in about mid-May, the man "kept coming during business hours to the front door" and "asking for assistance." A receptionist regularly advised him that the seminary did not provide assistance but that there were places where he could receive some assistance. The man "was becoming very persistent, agitated." The receptionist pointed him out to Father Warner, who observed the man from a window.

A few days before June 13, 2015, Father Warner and another priest were at a nearby restaurant, when the same man approached him, advised that his car was around the corner, that he was stranded and asking for money. Father Warner, having "seen him already on occasion," told the man that he was aware that he [had] "come to the seminary many times before" and had "been around." He then advised the man that he had "been instructed to where assistance can be given and there is no reason for [him] to come back to the seminary."

Father Warner was certain that the man who approached him was the same man depicted in the surveillance video.

NOPD Detective Sam Jennings testified that he was dispatched to investigate a possible theft at Notre Dame Seminary. He spoke with Father Warner, who advised him that an older, white, male had come to the seminary on several occasions seeking money but Father Warner had refused and asked the man not to return.

According to Det. Jennings, "[a]fter he had been barred from the property," he returned on June 13, 2015. He spoke with a female student, claiming he was there to see Father Warner and the student allowed him into the building. The man then entered a restroom and forced open a door which led to the secretary's office. From there, he entered a classroom from which a computer had been stolen, as evidenced by a "cut cable" which had previously secured the computer to the table. Det. Jennings testified that he viewed surveillance footage taken from the Seminary which showed Mr. Barker arriving at 12:39 pm and leaving at 1:13 pm.

As this evidence establishes, Mr. Barker was seen on the surveillance video attempting to gain entry into the seminary on Saturday, June 13, 2015. Father Warner testified that he learned that the computer was missing on Monday, two days later and that the cord which secured the computer to the classroom table had been cut and the computer had not been recovered. Clearly, a rational juror could have concluded the computer had been stolen. We further find that, based on the totality of the circumstances, a rational juror could find Mr. Barker guilty of the theft of the computer from the seminary.

As the evidence at trial established, Mr. Barker had come to the seminary on multiple occasions prior to June 13, 2015, seeking assistance. On each occasion, a receptionist informed Mr. Barker that the seminary did not provide assistance and advised him that there were other places he could seek assistance. A couple of days before June 13, 2015, Mr. Barker confronted Father Barker [sic] and asked for money. Father Warner refused his request, advised him that he had seen him at the seminary and asked him not to come to the seminary again. Nevertheless, Mr. Barker returned to the seminary, asked Ms. Prather for Father Warner, suggesting by his comment (that he was "fifteen minutes early") that he had a scheduled meeting with Father Warner. As Father Warner indicated, he was at a wedding on the morning of June 13, 2015 and had no scheduled appointments that day. On this basis, a reasonable juror could have found that Mr. Barker, having repeatedly been refused financial assistance from the seminary, used a subterfuge to gain access to the seminary.

While it was not until two days later, Monday, June 15, 2015, that it was discovered that the computer was missing, Father Warner found that the wall had been pushed in, file cabinets overturned and his secretary's office disheveled on the afternoon of June 13, 2015. Any rational juror could conclude from these facts that the theft of the computer had occurred on June 13, 2015. Likewise, a rational juror could easily have concluded that a stranger to the seminary forced open the sealed door, causing the damage to the wall, and "ransacked" the secretary's office in search of money or something of value, and continued to the room next door and stole the computer.

Considering the record as a whole, it is clear that the jury found Mr. Barker guilty of theft based on the circumstantial evidence presented and the similarity of the thefts at the Watson Memorial Teaching Ministries and Notre Dame Seminary: neither building was open to the general public, Mr. Barker had visited each building prior to the disappearances of the computers asking for money and using a ruse to gain entry (or in the case of Ms. Parker's computer, attempted to use a ruse – that he had misplaced his wallet – to gain entry into the building), and computers went missing after Mr. Barker's otherwise unauthorized presence.

As we found with respect to the theft of Ms. Parker's computer, the circumstantial evidence in this case consists of "'proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.'" Castro, 16-0284, p. 7 (La. App. 4 Cir. 12/14/16), 206 So.3d at 1064. Furthermore, under La. C.E. art. 401 and our jurisprudence, even if the charges had not been joined, the other crimes evidence would have been admissible in each case and the jury could have formed the same inference of guilt based on the similarity of the two thefts. As the Louisiana Supreme Court indicated in State v. Rose, 06-0402, p. 13 (La. 2/22/07), 949 So.2d 1236, 1243, "the State may introduce evidence of other crimes, wrongs or acts if it establishes an independent and relevant reason such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In Rose, the Supreme Court found that "t[t]he similar nature of [two]

crimes clearly demonstrates an identifiable, concrete, relevant pattern of behavior of the defendant that is so distinctively similar that one may logically infer that the same person committed both crimes.  Id., 06-0402, p. 16, 949 So.2d at 1245.

In State v. Taylor, 01-1638 pp. 10-16 (La. 1/14/03), 838 So.2d 729, 741-745, quoting State v. Colomb, 98-2813 p. 3 (La. 10/1/99), 747 So.2d 1074, 1076, the court held admissible evidence of all crimes the defendant allegedly committed in a spree lasting seven days and traversing several states observing that:

> integral act (*res gestae*) evidence in Louisiana incorporates a rule of narrative completeness without which the state's case would lose its ["]narrative momentum and cohesiveness, with power not only to support conclusions but to sustain the willingness of jurors to draw the inferences, whatever they may be, necessary to reach an honest verdict.["]

The court continued,

> "under the rule of narrative completeness incorporated into the *res gestae* doctrine 'the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault.'"

Id., quoting Old Chief v. United States, 519 U.S. 172, 188, 117 S.Ct. 644, 654, 136 L.Ed.2d 574 (1997).

In the instant case, under the current record and viewing the evidence in the light most favorable to the prosecution, a rational juror could have reasonably concluded that Mr. Barker was guilty of theft of the computer from Notre Dame Seminary.

## Count 9
### *Attempted simple burglary of an inhabited dwelling located at 8201 Oleander Street*

The crime of simple burglary of an inhabited dwelling is defined by La. R.S. 14:62.2 as follows:

> Simple burglary of an inhabited home is the unauthorized entry of any inhabited dwelling, house, apartment, or other structure used in whole or in part as a home or place of abode by a person or persons with the intent to commit a felony or any theft therein, other than as set forth in R.S. 14:60.[FN 12]

[FN 12]  La. R.S. 14:60 concerns aggravated burglary and requires a dangerous weapon or a battery.

Under La. R.S. 14:27, an attempted crime is defined as:

Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

The testimony regarding count 9 was elicited primarily from two witnesses, although a recording from a 911 emergency call was played for the jury as well. The first witness to testify was Martin Mitchell who lives at 8203 Oleander St., a duplex.  Mr. Mitchell lives in the upstairs unit and his tenant, David Dean, lives in the downstairs unit, 8201 Oleander St.[FN 13]  On June 14, 2015, Mr. Mitchell "happen[ed] to just look out the window" and he saw an elderly white haired Caucasian man within the gate of the yard that enclosed the property.  Feeling that the man was trespassing, Mr. Mitchell went out the back door to "see what [was] going on."  He could then see that the man was inside the screen door, in front of the door to the property.  When he asked the man what he was doing, the man mumbled something and left.

[FN 13]  The tenant's name is actually David Howard, who testified immediately after Mr. Mitchell.

Mr. Mitchell's tenant then came to the door, and they noticed that "there were indentations in his door, and in the doorknob, right, like someone was trying to jimmy it."  He saw the man across the street where a "meeting hall" is located and he asked the man "what is going on?"  His wife then called 911.

At that point in the trial, the 911 recording was played for the jury.[FN 14] In that call, Jewel Pichon reported an attempted break-in at her neighbor's house and identified the perpetrator as wearing an aqua-blue shirt and khaki pants, and carrying a black suitcase.  She stated that the suspect knocked on her door following the attempted break-in at her neighbor's house.  She watched the suspect leave her property and enter into the alleyway of 3201 Dublin St. through the back gate.  She also stated that the suspect had used a screwdriver in an attempt to "jimmy the locks," and had left it behind at the neighbor's residence.

[FN 14]  The recording of the 911 call had previously been authenticated by Officer Nicole Jones, the custodian of records for incident recall reports for the NOPD.

Within ten or fifteen minutes of the 911 call, the police arrived at the property and Mr. Mitchell and his tenant sent him across the street where they had

last seen the man, who was then arrested. The man was brought back for Mr. Mitchell who identified him as the man he had seen on his property. Photographs of the door which had been taken on that day were shown to Mr. Mitchell at trial and he agreed that the damage to the doorknob depicted in the photos was "in the same location as where [he] observed [Mr. Barker]."

Mr. Howard was next to testify. He indicated that he left his home to get something to eat and saw a gentleman "leaning up against the reception hall" (Golean's) across the street. When he returned, he spoke with Mr. Mitchell, who told him that there had been a man knocking on the doors to the property and Mr. Mitchell's wife "had him go downstairs to remove the guy from the premises." Later that afternoon, he saw the same man having been arrested at the reception hall. Mr. Howard confirmed that the property was surrounded by a metal fence and two gates; to get to his front door, one must first open a screen door.

According to Mr. Howard, Mr. Mitchell advised him that the man who had been at the door had "had [sic] taken off before he could run him off the property." He then examined the front doorknob and felt something sharp on his thumb; he testified that "someone had tried to knock the doorknob off of [his] front door." Mr. Howard was shown photographs of the doorknob. He confirmed that the doorknob was in fact, the doorknob to his home and the damage to it had not been present the last time he had used the door. Mr. Howard did not know Mr. Barker and had never seen him before. He stated that he had not invited Mr. Barker onto his property or inside his residence

In Mr. Barker's counseled brief, there is an assertion that "David Howard did not testify at the trial." It then states that "Martin Mitchell, his landlord and neighbor, told the jury that Mr. Howard said the marks on his doorknob were recent." The limited argument, thus, was that the conviction was based on "uncorroborated hearsay." A counseled reply brief was then filed,[FN15] which corrected this fact and then made the argument that "[t]he testimony of Mr. Howard and Mr. Mitchell is conflicting as to where Mr. Howard was when Mr. Mitchell confronted Mr. Barker." Mr. Barker then argued that "should Mr. Howard have been in the house as Mr. Mitchell testified, it would mean that he had entered his home without ever noticing that the door had been damaged, indicating the damage could have been done at some earlier time and also not noticed."

> [FN 15]  The counseled reply brief was filed after Mr. Barker filed a *pro se* brief (entitled "Appellant's Amendment to Appellant Counsel's Original Brief[,] Alternative Clarification [of] Original Brief Errors & Omissions;" hereafter referred to as "Amendment") and raised the issue of the error in the counseled brief. Mr. Barker argues that Mr. Howard testified that he spoke to his neighbor after he returned home from dining, which he asserts contradicts Mr. Mitchell's testimony that Mr. Howard had come out of his door after Mr. Mitchell thwarted the intruder's attempts. Mr. Barker argues that Mr. Mitchell's testimony is therefore unreliable and should be discounted entirely.

We do not view the testimony of Mr. Mitchell and that of Mr. Howard to be so conflicting as to be unreliable. First, while Mr. Howard did not testify that he saw Mr. Mitchell outside in the yard when he returned home, he was not asked this question directly; rather, he simply stated that his conversation with Mr. Mitchell about the attempted burglary occurred at some point after he returned from his meal. Second and more importantly,

> [c]onflicting statements as to factual matters is a question of weight of the evidence, not sufficiency. State v. Jones, 537 So.2d 1244 (La. App. 4 Cir. 1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. Id. A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. State v. Vessell, 450 So.2d 938 (La. 1984).

State v. Wells, 10-1338, p. 5 (La. App. 4 Cir. 3/30/11), 64 So.3d 303, 306. "The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction." Id.

In this case, the jury heard Mr. Mitchell testify that he witnessed Mr. Barker enter the screen door of his neighbor's home. After the man "took off" when Mr. Mitchell confronted him, it was discovered that someone had tried to "jimmy" the doorknob of the front door. The jury also heard Mr. Howard testify that the doorknob had not been damaged when he last used it. Likewise, the jury viewed pictures of the damage to Mr. Howard's door hardware and learned that Mr. Barker possessed a hammer, pliers, and several screwdrivers when he was searched incident to arrest.[FN 16] Additionally, the jury heard evidence that implicated Mr. Barker in several other burglaries and thefts.

> [FN 16] During the course of trial, NOPD Officer Walter Fuquay, who had been dispatched to the Oleander St. property to investigate a suspicious male subject tampering with doorknobs, testified that he and other officers arrested Mr. Barker. During a search incident to the arrest, the officers discovered several screwdrivers and pliers, and a search of Mr. Barker's backpack revealed several more screwdrivers, a hammer, needle-nose pliers, electronic cords, a computer mouse, a green T-Shirt, and several computer software discs.

Based on the totality of the evidence at trial, and having viewed the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found the Mr. Barker guilty of the crime of attempted simply burglary of an inhabited dwelling.[28]

---

[28] State v. Barker, 317 So. 3d 422, 436-45 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.

Additionally, this Court notes that as part of his challenge to the sufficiency of the evidence, petitioner contends that his convictions were tainted by the use of an improper identification procedure.[29]   Therefore, it must be noted that the Louisiana Fourth Circuit Court of Appeal also separately addressed – and rejected – that contention on direct appeal, holding:

> Mr. Barker contends that the trial court erred when it admitted identification evidence because the single-photograph identification procedure employed was unduly suggestive and rendered the identifications unreliable.  The transcripts in the instant case reveal that the state introduced its exhibits nine and ten (the still photos of Mr. Barker taken from the surveillance footage, signed by Ms. Parker and Ms. Watson) during trial and examined Ms. Parker, Ms. Watson, and Detective DiMarco regarding the "identification procedure" conducted in this case without objection.  However, because Mr. Barker made the same claim and argument at the hearing on the motions to suppress as he does in this appeal, and under La. C.Cr.P. 84(B), the issue appears to have been sufficiently preserved.
> Our jurisprudence reflects:
>
> A defendant attempting to suppress an identification must prove both that the identification itself was suggestive and that there was a likelihood of misidentification as a result of the identification procedure.  State v. Prudholm, 446 So.2d 729, 738 (La. 1984).  An identification procedure is unduly suggestive if, during the procedure, the witness's attention is unduly focused on the defendant.  State v. Robinson, 386 So.2d 1374, 1377 (La. 1980).  For this reason, identifications arising from single-photograph displays may be viewed in general with suspicion.  Simmons v. United States, 390 U.S. 377, 383, 88 S.Ct. 967, 970-971, 19 L.Ed.2d 1247 (1968); State v. Martin, 595 So.2d 592, 595 (La. 1992).  The central question, however, is whether under the totality of the circumstances the identification was reliable even though the confrontation procedure was suggestive.  Neil v. Biggers, 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).  Thus, despite the existence of a suggestive pre-trial identification, an in-court identification is permissible if, under all the circumstances, there does not exist "a very substantial likelihood of irreparable misidentification." Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977) (quoting Simmons, 390 U.S. at 384, 88 S.Ct. at 971).

---

[29] Rec. Doc. 1-1, p. 41.

If an identification procedure is suggestive, courts must look, under the totality of the circumstances, to several factors in evaluating the likelihood of misidentification.  Neil v. Biggers, 409 U.S. at 199, 93 S.Ct. at 382; Martin, 595 So.2d at 595.  These factors include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation.  Biggers, 409 U.S. at 199-200, 93 S.Ct. at 382; Brathwaite, 432 U.S. at 114, 97 S.Ct. at 2253; Martin, 595 So.2d at 595.

State v. Sparks, 88-0017, pp. 52-53 (La. 5/11/11), 68 So.3d 435, 477.

In the instant case, while both Ms. Parker and Ms. Watson identified Mr. Barker from a single photograph, after analyzing the totality of the circumstances, there is very little likelihood of misidentification.  First, both witnesses had ample opportunity to view Mr. Barker.  Ms. Watson had spoken to him earlier in the day when he approached asking for money, and immediately recognized him as the same man when she saw him later in the hallway near Ms. Parker's office.  Ms. Parker greeted Mr. Barker when he entered the building and had a conversation with him inside her office.  Second, both women testified that they viewed Mr. Barker with extreme suspicion at the time they encountered him and believed his motives were dishonest.  We find it reasonable that both women would have paid close attention to Mr. Barker with their suspicions raised and would have observed him more carefully.

Third, Mr. Barker fits Ms. Parker's description of the perpetrator on the 911 phone call as an unshaven, Caucasian male, in his late forties or early fifties, with an arm tattoo.  Ms. Watson also testified that [the] perpetrator had a backpack, which Mr. Barker is seen carrying in both the surveillance and the police body camera footage.  Fourth, Ms. Parker and Ms. Watson both testified that they were able to identify Mr. Barker from the picture they were shown, and both identified him again from the same photos during their testimony.

Officer DiMarco also testified that he had only seen Mr. Barker on the surveillance footage and in the still photos, but immediately recognized Mr. Barker once he arrived at Goleans' reception hall where he was arrested.  All three witnesses, therefore, positively identified Mr. Barker as the same man in the still photos.

Finally, Ms. Parker signed the photo from which she identified Mr. Barker and dated it June 17, 2015, one week after she realized Mr. Barker had stolen her laptop.  In Biggers, the court found that, although a seven-month lapse between the crime and the identification procedure weighed negatively in the totality of the circumstances, it did not preclude a reliable identification in that case.  Similarly, the court in Sparks found that a two-and-a-half-year lapse between the crime and photographic confrontation was not fatal to an otherwise reliable single-photo

identification procedure.  Here, we find that a seven or eight day lapse does not render the identification of Mr. Barker unreliable.

Moreover, there is additional evidence which reduced the likelihood of misidentification in this case.  Ms. Watson testified that when Mr. Barker approached Weston [sic] Ministry earlier in the day, he told her he was from Biloxi, and was down on his luck and needed money.  Father Warner testified that when Mr. Barker approached him outside the restaurant, he claimed his car had broken down leaving him stranded and in need of money.  Also, on Officer Fuquay's body camera video, Mr. Barker stated that he was from Biloxi, but became stranded in New Orleans.  Mr. Barker also told potential jurors during voir dire that he was from Biloxi but his car had broken down here in New Orleans, and during his *pro se* opening statement at trial, he stated that he was from Biloxi, but was stranded in New Orleans after his car broke down.  Finally, in Mr. Barker's ["]Amendment," he asserts that the facts show "a man from out of town, his vehicle disabled and the man trying to find a place out of the elements like many other down and out persons in the city."

Not only did Ms. Parker provide a fair description of Mr. Barker to police prior to viewing the picture, Ms. Watson stated the perpetrator carried a backpack and had told her the same story that Mr. Barker had apparently related to nearly every trial witness with whom he interacted, including the jury and this Court.  Accordingly, we do not perceive a "substantial likelihood of irreparable misidentification" by the two witnesses who identified Mr. Barker as the perpetrator from the single-photo identification procedure.

Mr. Barker's claim that the surveillance footage and the still photo taken therefrom were "illegible" is unconvincing.  The jury had the opportunity to view the surveillance footage and the still photos, and to observe Mr. Barker in the court room prior to his exit.  As the finders of fact, the jurors were entitled to make their own determinations.  Our review of the surveillance footage and still photos submitted as evidence belies Mr. Barker's assertion that they were "illegible."

We are also unconvinced by Mr. Barker's contention that he was never identified as having been on Mr. Mitchell's property.  Mr. Mitchell specifically testified that he saw Mr. Barker, approached him, and spoke to him before Mr. Barker walked away.  Additionally, Mr. Barker was shown on police body camera footage at the reception hall directly across the street from Mr. Mitchell's property and Mr. Mitchell is seen on that same footage identifying Mr. Barker in person as the same individual he observed on his property moments before.

This assignment of error is without merit. [30]

---

[30] <u>State v. Barker</u>, 317 So. 3d 422, 462-65 (La. App. 4th Cir. 2018) (footnote omitted); State Rec., Vol. 21 of 21.

As noted, petitioner filed with the Louisiana Supreme Court a writ application challenging the Court of Appeal's direct-review judgment; however, the Louisiana Supreme Court summarily denied that application.[31]

Here, the state courts correctly identified the controlling federal precedent governing sufficiency claims, i.e. <u>Jackson v. Virginia</u>, 443 U.S. 307 (1979).  The <u>Jackson</u> standard is clear and simple:  "Under <u>Jackson</u>, evidence is sufficient to support a conviction if, 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  <u>Coleman v. Johnson</u>, 566 U.S. 650, 654 (2012) (quoting <u>Jackson</u>, 443 U.S. at 319).  Therefore, "the <u>Jackson</u> inquiry does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit."  <u>Herrera v. Collins</u>, 506 U.S. 390, 402 (1993).

Further, because the <u>Jackson</u> standard is itself deferential, and because the AEDPA's standards of review are also deferential, a federal habeas court's review of a sufficiency claim is in fact "twice-deferential."  <u>Parker v. Matthews</u>, 567 U.S. 37, 43 (2012).  As the Supreme Court has explained:

> We have made clear that <u>Jackson</u> claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference.  First, on direct appeal, "it is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial.  A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury."  <u>Cavazos v. Smith</u>, 565 U.S. 1, ——, 132 S.Ct. 2, 4, 181 L.Ed.2d 311 (2011) (per curiam).  And second, on habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court.  The federal court instead may do so only if the state court

---

[31] <u>State v. Barker</u>, 267 So. 3d 85 (La. 2019), <u>reh'g refused</u>, 278 So. 3d 361 (La. 2019); State Rec., Vol. 21 of 21.

decision was 'objectively unreasonable.'" Ibid. (quoting Renico v. Lett, 559 U.S. 766, ——, 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010)).

Johnson, 566 U.S. at 651.

In addition, the Court must be mindful of the following guiding principles concerning such claims.

First, contrary to what appears to be the main thrust of petitioner's argument herein, Jackson does not require that there be direct evidence to support a conviction. Rather, "**[e]ither** direct **or** circumstantial evidence can contribute to the sufficiency of the evidence underlying the conviction," and circumstantial evidence can alone be sufficient to satisfy the Jackson test. Schrader v. Whitley, 904 F.2d 282, 287 (5th Cir. 1990) (emphasis added); accord United States v. Algee, 599 F.3d 506, 512 (6th Cir. 2010) ("Circumstantial evidence alone is sufficient to sustain a conviction …."); United States v. Jackson, 863 F.2d 1168, 1173 (4th Cir. 1989) ("[C]ircumstantial evidence is treated no differently than direct evidence, and may be sufficient to support a guilty verdict ….").

Second, unlike Louisiana law,[32] federal law does not require that every reasonable hypothesis of innocence be excluded in cases based on circumstantial evidence. See Jackson, 443 U.S. at 326 ("Only under a theory that the prosecution was under an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt could this petitioner's challenge be sustained. That theory the Court has rejected in the past. We decline to adopt it today." (citation omitted)). And, on federal habeas review, **only** the federal standard is applied, even if state law would impose a more demanding standard of proof. Foy v. Donnelly, 959 F.2d 1307, 1314 n.9

---

[32] See La. Rev. Stat. Ann. § 15:438 ("The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.").

(5th Cir. 1992) ("We do not … apply the Louisiana circumstantial evidence standard – to the extent it is more onerous – that requires the evidence to be inconsistent with every reasonable hypothesis of innocence."); Higgins v. Cain, Civ. Action No. 09-2632, 2010 WL 890998, at *21 n.38 (E.D. La. Mar. 8, 2010), aff'd, 434 F. App'x 405 (5th Cir. 2011); Williams v. Cain, No. 07-4148, 2009 WL 224695, at *4 (E.D. La. Jan. 29, 2009), aff'd, 408 F. App'x 817 (5th Cir. 2011); see also Johnson, 566 U.S. at 655 ("Under Jackson, federal courts must look to state law for the substantive elements of the criminal offense, but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." (citation and internal quotation marks omitted)).

Applying those precepts, the undersigned simply cannot say that the state court decision denying petitioner's sufficiency claims was unreasonable. On Count 5, petitioner was identified by Ms. Parker and Ms. Watson as having been at the scene of the crime and in close proximity to the stolen laptop shortly before it went missing. On Count 6, he was identified by Ms. Prather as having been at the scene of the crime, and her identification was further corroborated by video surveillance footage showing him there. In addition, Father Warner noticed the damage to property later that same day and the missing computer a few days later; he also identified petitioner as having been at the property previously and acting suspiciously. On Count 9, Mr. Mitchell observed petitioner at the scene of the crime, and, shortly thereafter, it was discovered that the apartment door had been "jimmied" and petitioner was apprehended in the area (at another property where he did not belong) with burglary tools. Moreover, although petitioner challenges the reliability of the identifications, the eyewitnesses had ample opportunity to observe him and there was little chance of misidentification – and, again, as to Count 6, the reliability of the

identification was corroborated by video footage. Because the evidence against him, albeit largely circumstantial, was abundant and convincing, and because that evidence must be viewed in the light most favorable to the prosecution, the guilty verdicts on these counts simply were not irrational and the state court decision denying the sufficiency challenges was not unreasonable.

## 2.  Remaining Counts

To the extent that petitioner is challenging the sufficiency of the evidence as to his convictions on the remaining counts, the state raises two procedural defenses:  exhaustion and procedural default.

It is beyond debate that a petitioner normally must have first exhausted his remedies in the state courts before seeking federal habeas corpus relief.  28 U.S.C. § 2254(b)(1).  Regarding that requirement, the United States Supreme Court has explained:

> The exhaustion doctrine is principally designed to protect the state courts' role in the enforcement of federal law and prevent disruption of state judicial proceedings.  Under our federal system, the federal and state courts are equally bound to guard and protect rights secured by the Constitution.  Because it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation, federal courts apply the doctrine of comity, which teaches that one court should defer action on causes properly within its jurisdiction until the courts of another sovereignty with concurrent powers, and already cognizant of the litigation, have had an opportunity to pass upon the matter.

Rose v. Lundy, 455 U.S. 509, 518 (1982) (footnote, citations, quotation marks, and brackets omitted).  To satisfy that exhaustion requirement, a petitioner must have fairly presented his claims to the state's highest court (which in this case would be the Louisiana Supreme Court, see La. Const. art. V, § 5(A)) in a procedurally proper manner according to state court rules.  See Dupuy v. Butler, 837 F.2d 699, 702 (5th Cir. 1988).

Therefore, the question here is whether petitioner fairly presented to the Louisiana Supreme Court any claims squarely challenging the sufficiency of the evidence on the remaining counts. The answer: no, he did not. The undersigned has reviewed all five post-trial writ applications petitioner filed with the Louisiana Supreme Court in this matter (which were filed in Case Nos. 2018-KO-0968, 2019-KH-541, 2019-KH-1605, 2021-KH-00705, and 2021-KH-01652)[33] and not one of those writ applications fairly presented a challenge to the sufficiency of the evidence as to any of his remaining convictions. Therefore, to the extent that petitioner is now asserting sufficiency claims concerning those convictions in this federal proceeding, those claims are unexhausted.

That fact then poses another obstacle to federal review of those claims. Specifically, the United States Fifth Circuit Court of Appeals has explained: "[W]hen a prisoner fails to exhaust available state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred," then the claims are also considered procedurally defaulted in federal court. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997) (internal quotation marks omitted).

Here, there is little doubt that the Louisiana state courts would procedurally bar any attempts by petitioner to assert such claims in a new state application. In fact, when denying him post-conviction relief in 2021, the Louisiana Supreme Court expressly warned petitioner:

> Applicant has now fully litigated his application for post-conviction relief in state court. Similar to federal habeas relief, see 28 U.S.C. § 2244, Louisiana post-conviction procedure envisions the filing of a second or successive application only under the narrow circumstances provided in La.C.Cr.P. art. 930.4 and within the limitations period as set out in La.C.Cr.P. art. 930.8. Notably, the legislature in 2013 La. Acts 251 amended that article to make the procedural bars against

---

[33] Those writ applications are included in Volume 21 of the State Court Record.

> successive filings mandatory.  Applicant's claims have now been fully litigated in accord with La.C.Cr.P. art. 930.6, and this denial is final.  Hereafter, unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, applicant has exhausted his right to state collateral review.[34]

Therefore, the claims have been procedurally defaulted, and petitioner is not entitled to federal review of them unless (1) both "cause" exists for his default and "prejudice" would result from the application of the procedural bar or (2) the Court's failure to address the claims would result in a "fundamental miscarriage of justice."  See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004).

"To establish cause for a procedural default, there must be something *external* to the petitioner, something that cannot fairly be attributed to him."  Johnson v. Puckett, 176 F.3d 809, 816 (5th Cir. 1999) (quotation marks omitted).  As noted, petitioner's claims were defaulted here because he did not present them to the Louisiana Supreme Court, as he could have done on direct review.  In his direct appeal to the Louisiana Fourth Circuit Court of Appeal, petitioner was not only represented by counsel, but he also filed his own pro se brief asserting the additional claims he felt his appellate attorney had neglected.  Had he been so inclined, he could have included in that pro se brief additional claims challenging the sufficiency of the evidence on the remaining counts – and, if those claims were denied, he could then have sought further review in his related Louisiana Supreme Court writ application, which he also filed pro se.  He did not do so.  Because he opted not to assert the claims on direct review, the "cause" for his default of the claims is directly attributable to his own choices, and is therefore insufficient to overcome the federal

---

[34] State v. Barker, 324 So. 3d 83 (La. 2021), reh'g refused, 328 So. 3d 78 (La. 2021); State Rec., Vol. 21 of 21.

procedural bar. Moreover, "[a]bsent a showing of cause, it is not necessary for the court to consider whether there is actual prejudice." Martin v. Maxey, 98 F.3d 844, 849 (5th Cir. 1996).

Because petitioner has not met the "cause and prejudice" test, the claims are barred from federal review unless he shows that the application of the procedural bar would result in a "fundamental miscarriage of justice." That is no easy task. On the contrary, the United States Fifth Circuit Court of Appeals has explained:

> Fundamental miscarriage of justice is limited to cases where the petitioner can make a persuasive showing that he is actually innocent of the charges against him. This claim of actual innocence is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits. **Proving such a claim is daunting indeed, requiring the petitioner to show, as a factual matter, that he did not commit the crime of conviction. The petitioner must support his allegations with new, reliable evidence that was not presented at trial** and must show that it was more likely than not that no reasonable juror would have convicted him in the light of the new evidence. Such new, reliable evidence may include, by way of example, exculpatory scientific evidence, credible declarations of guilt by another, trustworthy eyewitness accounts, and certain physical evidence.

McGowen v. Thaler, 675 F.3d 482, 449-500 (5th Cir. 2012).

Here, not only has petitioner failed to offer new evidence of that caliber, he has failed to offer any new evidence whatsoever. Therefore, he has not met "the threshold requirement" for an actual innocence claim, i.e. he has not persuaded the Court "that, in light of the **new** evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." Reed v. Stephens, 739 F.3d 753, 767 (5th Cir. 2014) (emphasis added; quotation marks omitted).

For those reasons, any claims challenging the sufficiency of the evidence as to any convictions other than those on Counts 5, 6, and 9 are procedurally barred from federal review and need not be considered by this Court.[35]

### B.  Claim Concerning the Joinder of – and the Failure to Sever – Offenses

Petitioner claims that he was prejudiced as of a result of his charges being improperly joined and not severed for separate trials.[36]  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> In his second assignment of error, Mr. Barker's counseled brief argues that the trial court erred in denying his motion to sever the offenses.  He contends that the crimes charged led the jury to infer a criminal disposition, evidenced by its verdicts of guilty on charges for which Mr. Barker maintains the State otherwise presented insufficient evidence.[FN 17]

>> [FN 17]  Mr. Barker's Amendment makes the unsupported assertion that the court denied his motion to sever out of spite and with vindictive intent as retribution for naming the court in a civil lawsuit he filed.  We note that Mr. Barker's motion to sever filed in pre-trial posture claimed only that the bill of information improperly joined misdemeanor charges with felony charges.  At trial, the indictment, as read by the court, included only seven charges, omitting the two misdemeanors.  Later in the trial, during a break between witnesses and out of the presence of the jury, the court acknowledged the two misdemeanor charges separately (possession of burglary tools, and simple criminal damage to property inside Notre Dame Seminary) and indicated that it would hold a judge trial contemporaneously with the jury trial.  Additionally, the court minutes reflect only seven charges in the "violations" section.  Accordingly, although it is not reflected in the indictment contained in the record, it appears the two misdemeanor charges were indeed severed from the felonies for statutory purposes, and the trials combined for expediency and efficacy.

> Under La.C.Cr.P. art. 493:

> Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses

---

[35] Nonetheless, they would fail on the merits even if considered.  The evidence regarding the remaining felony counts was summarized by the Louisiana Fourth Circuit Court of Appeal in its discussion of petitioner's next claim concerning the joinder of offenses.  That summary, which is quoted in its entirety *infra*, is found in the Court of Appeal's opinion at State v. Barker, 317 So. 3d 422, 448-49 (La. App. 4th Cir. 2018), a copy of which is included in Volume 21 of the state court record.  The evidence, when viewed in the light most favorable to the prosecution, was similarly sufficient to support the convictions on those counts.

[36] Rec. Doc. 1-1, pp. 38-40.

charged, whether felonies or misdemeanors, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan; provided that the offenses joined must be triable by the same mode of trial.

The joinder of offenses is subject to the provisions of La. C.Cr.P. art. 495.1, as well, which provides:

If it appears that a defendant or the state is prejudiced by a joinder of offenses in an indictment or bill of information or by such joinder for trial together, the court may order separate trials, grant a severance of offenses, or provide whatever other relief justice requires.

State v. Nix, 2007-1431, pp. 11-12 (La. App. 4 Cir. 6/18/08), 987 So.2d 855, 862, quoting the Supreme Court in State v. Deruise, 98-0541, p. 7 (La. 4/3/01), 802 So.2d 1224, 1232, indicated:

A motion to sever is addressed to the sound discretion of the trial court, and the court's ruling should not be disturbed on appeal absent a showing of an abuse of discretion. [State v.] Brooks, 541 So.2d [801] at 804 [[La. 1989]] (citing State v. Williams, 418 So.2d 562, 564 (La. 1982)). In ruling on such a motion, the trial court must weigh the possibility of prejudice to the defendant against the important considerations of economical and expedient use of judicial resources. In determining whether joinder will be prejudicial, the court should consider the following: (1) whether the jury would be confused by the various counts; (2) whether the jury would be able to segregate the various charges and evidence; (3) whether the defendant would be confounded in presenting his various defenses; (4) whether the crimes charged would be used by the jury to infer a criminal disposition; and (5) whether, especially considering the nature of the charges, the charging of several crimes would make the jury hostile. Id. (quoting State v. Washington, 386 So.2d 1368, 1371 (La. 1980)). However, the fact that evidence of one of the charges would not be admissible under State v. Prieur, 277 So.2d 126 (La. 1973), in a separate trial on the joined offense, does not per se prevent the joinder and single trial of both crimes, if the joinder is otherwise permissible. State v. Davis, 92-1623 (La. 5/23/94), 637 So.2d 1012, 1019 (citing State v. Celestine, 452 So.2d 676 (1984)). Finally, there is no prejudicial effect from joinder of two offenses when the evidence of each is relatively simple and

distinct, so that the jury can easily keep the evidence of each offense separate in its deliberations.  Brooks, 541 So.2d at 805.

We note, too, that a "defendant bears a heavy burden of proving prejudicial joinder of offenses, and he must make a clear showing of prejudice."  State v. Ennis, 11-0976, p. 11 (La. App. 4 Cir. 7/5/12), 97 So.3d 575, 582.

This Court stated in State v. Carter, 99-2234, pp. 34-35 (La. App. 4 Cir. 1/24/01), 779 So.2d 125, 145 that "severance is not required if the facts of each offense are not complex, and there is little likelihood that the jury will be confused by the evidence of more than one crime."  Additionally, "the trial judge can mitigate any prejudice from joinder of offenses by providing clear instructions to the jury."  State v. Labuzan, 480 So.2d 420 422 (La. App. 4 Cir. 1985).

In Ennis, this Court found no abuse of the trial court's discretion in the joinder of separate charges of simple burglary and attempted simple burglary of an inhabited dwelling, each of which called for different witnesses.  The Court noted that "the evidence of the two offenses was relatively simple and distinct," that there was "no evidence suggesting that appellant was [']confounded['] in presenting a defense, that is, that he wished to testify on one count but not on the other, and was effectively prevented by the joinder from testifying at all," "[n]or ... anything in the record to suggest that the state joined the offenses to show appellant's criminal propensity or that the jury became hostile because of the joinder."  Id., pp. 10-11, 97 So.3d at 582.

Similarly, in State v. Sam, 99-0300, p. 15 (La. App. 4 Cir. 4/19/00), 761 So.2d 72, 81-82, this Court held that joinder of armed robbery and two counts of first-degree robbery was not prejudicial where the facts of each offense were not confusing and could be easily distinguished by the jury; the offenses were similar in nature, triable by the same mode of trial, and occurred within a five-day period; the victims presented separate and concise testimony concerning the robberies; and the testifying police officers distinguished each offense.

In the instant case, the crimes charged are all related to burglaries and thefts and were committed in the same area of town over the course of four days.  The State presented witnesses orderly and succinctly such that the evidence flowed in a linear timeline from one crime scene to the next, allowing the jury to maintain a separation of the charges and evaluate the evidence accordingly.  Additionally, during closing argument, the State walked the jury through the evidence as applicable to each element of each charged offense related to each separate crime scene.  The trial court also provided the jury with instructions to consider "each count and the evidence pertaining to it" separately.

Moreover, as we have already discussed, notwithstanding a lack of eyewitness or surveillance evidence presented on the charge of theft of the computer from Notre Dame Seminary, even at a trial on that charge alone, the "other crimes" evidence that Mr. Barker committed a theft of the computer from Weston [sic] Ministries would have been admissible under La. C.E. 404(B)(1) to show intent, preparation, identity, and modus operandi.

Based on the record before us, we do not find that Mr. Barker met the heavy burden of proving prejudicial joinder of offenses or a clear showing of prejudice.

We further note that, in balancing the possible prejudice to Mr. Barker from the joinder of his charges at a single trial against the economical and expedient use of judicial resources, joinder of the charges was warranted.  The record indicates that Mr. Barker filed a litany of what appear to be repetitive, dilatory, and baseless pre-trial motions,[FN 18] including a motion for mistrial which he made during his *pro se* opening remarks to the jury by discussing information the court expressly warned him not to discuss under penalty of contempt of court.[FN 19]  Mr. Barker also filed a civil lawsuit naming every judge but one in the Orleans Parish Criminal District court and every defense counselor appointed to him throughout the judicial process, and attempted (unsuccessfully) to argue that a "conflict of interest" constituted grounds for a mistrial, to quash the indictment, and for recusal of the court.   Clearly, Mr. Barker intended to thwart "important considerations of economical and expedient use of judicial resources."  Deruise, 98-0541, p. 7, 802 So.2d at 1232.

[FN 18]  The sheer volume of pre-trial motions Mr. Barker filed precludes them from an exhaustive listing.  See footnote 1.

[FN 19]  See footnote 7.  We also note that Mr. Barker filed a post-trial motion requesting that every judge employed at the Criminal District Court review the entire procedural process of his trial from the time of his arrest and submit an opinion as to its constitutionality.

We find no merit to this assignment of error.

As an aside, Mr. Barker was convicted of three other felonies as well, for which no sufficiency of the evidence claims were raised.  We note them, however, as they further support the joinder of the counts against Mr. Barker (for one of which there was direct evidence in the form of video surveillance) and because they are relevant to the issue of joinder and other issues raised in this appeal.

First, Mr. Barker was convicted on Count 1 of the burglary of Golean's, which took place on June 14, 2015, and of criminal damage to property.  The evidence supporting this conviction which was adduced at trial includes the testimony of Mr. Howard and Mr. Mitchell, who both saw Mr. Barker at the reception hall, shortly after he left their property on Oleander Street, and the testimony of NOPD Officer Walter Fuquay.  Officer Fuquay testified that, after being dispatched to investigate a suspicious man tampering with doorknobs and in the alley near Golean's, he discovered a hole in the rear wall of the building that appeared to have been "kicked in."  Officer Fuquay, accompanied by several other officers, located Mr. Barker inside the building hiding in a rear storage room, apprehended him and placed him in handcuffs.  It was during a search of Mr. Barker that multiple tools and other items, including "homeless assistance information from the Archdiocese of New Orleans," were discovered in his possession.[FN 20]

[FN 20]  See footnote 15.

Officer Fuquay described several photographs taken from the scene which depicted the tools recovered from Mr. Barker, his backpack, a deadbolt door lock which appeared damaged, likely by pliers, the interior of the building in which a large television had been dismounted from the wall and set on the floor, a television remote control and electrical cord, which Officer Fuquay stated he also discovered on Mr. Barker, and an interior view of a storage area with the large hole in the wall which Fuquay suspected was created by Mr. Barker to gain access into the building.

Officer Fuquay testified that the residents from the duplex on Oleander Street identified Mr. Barker as the perpetrator of their criminal complaints.

David Warren, the owner of Golean's, testified that he arrived at the business after the police notified him of the break-in.  He observed Mr. Barker after his arrest but stated that he had never seen him before and Mr. Barker did not have permission to be on the premises.  Mr. Warren further testified that he had been at the reception hall the day before and the rear wall had not been damaged.  Mr. Warren also confirmed that the remote control and power cord found in Mr. Barker's possession had belonged with the television as well.  Mr. Warren also testified that he observed damage to the deadbolt lock on the front door, which had not been present the day before, and which he believed was caused by an attempt to remove it with a hammer and screwdriver.

Second, Mr. Barker was convicted on Count 4 of simple burglary of a shed (located at 1116 Napoleon Avenue).   The evidence supporting this conviction included the testimony of Ariana Heintzen, who indicated that, on June 9, 2015, she arrived home at 1116 Napoleon Avenue, a duplex, to find her garage open and items missing.  She testified that when she had left her residence, the garage door was closed, but when she returned nearly two hours later, she noticed the garage was open, which was unusual, and the neighbor's bicycle was outside, which was also unusual, as it was generally stored in the back of the garage and out of direct sight.  Ms. Heintzen testified that her neighbor indicated to her that she had been at work all day and had not moved her bicycle from its usual location.  Ms. Heintzen also contacted her boyfriend, with whom she resided at that residence via "Facetime" and, through the cell phone video camera, he was able to see that his air compressor was missing from its usual storage location in the garage.

The surveillance video (of the front porch of the residence) was played in open court.  The video depicts a Fed Ex deliveryman placing a large blue "chow" box on the front porch, ringing the doorbell, and leaving the premises.  Several minutes later, Mr. Barker is seen, carrying a large backpack and riding a bike down the sidewalk.  As he rides down the sidewalk, he looks up onto the porch of each house he passes before stopping at Ms. Heintzen's residence.  He parks his bicycle in the driveway of the residence with only the rear tire visible in the camera frame.  He then walks onto the porch and knocks on the front door; he then leaves the porch and walks down the driveway toward the rear of the house.  Around five minutes later, the bicycle is moved out of the camera frame toward the rear of the driveway.

Within minutes, Mr. Barker is seen riding his bicycle back up the driveway toward the street and a large dark object with bright yellow spirally-wound cords is mounted directly behind the bicycle seat.

Ms. Heintzen testified at trial that the video did not depict any other person entering or exiting her property during that time period. She also stated that she did not know the person in the video and had never seen him before.

Michael Shlansky, Ms. Heintzen's husband, corroborated Ms. Heintzen's testimony and identified his air compressor as the dark item with the yellow cords mounted to Mr. Barker's bicycle as he rode away on the surveillance footage. He testified that he did not know the man in the video and had not given him permission to take his air compressor, which was never returned. [37]

The Louisiana Supreme Court thereafter denied petitioner's related writ application without assigning additional reasons.[38]

To the extent that petitioner is contending that the state courts misapplied the provisions of state law concerning joinder and severance, that issue is not properly before this federal court. As the United States Supreme Court has explained:

> [I]t is only noncompliance with *federal* law that renders a State's criminal judgment susceptible to collateral attack in the federal courts. The habeas statute unambiguously provides that a federal court may issue the writ to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). And we have repeatedly held that "'federal habeas corpus relief does not lie for errors of state law.'" Estelle v. McGuire, 502 U.S. 62, 67, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991) (quoting Lewis v. Jeffers, 497 U.S. 764, 780, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990)). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." 502 U.S., at 67-68, 112 S.Ct. 475.

Wilson v. Corcoran, 562 U.S. 1, 5 (2010).

To the extent that petitioner is instead asserting a federal violation, his claim would be that trying the various counts together was a due process violation depriving him of a fair trial. See Manning v. Warden, Louisiana State Penitentiary, 786 F.2d 710, 711-12 (5th Cir. 1986); Alvarez

---

[37] State v. Barker, 317 So. 3d 422, 445-49 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.

[38] State v. Barker, 267 So. 3d 85 (La. 2019), reh'g refused, 278 So. 3d 361 (La. 2019); State Rec., Vol. 21 of 21.

v. Wainwright, 607 F.2d 683, 685 (5th Cir. 1979).  However, it is not easy to prevail such a claim for the following reasons.

"Severance is within the discretion of the trial court and is required only in cases of compelling prejudice."  Breeland v. Blackburn, 786 F.2d 1239, 1241 (5th Cir. 1986) (quotation marks omitted).  Moreover, "[t]he burden of demonstrating prejudice is a difficult one, and the ruling of the trial judge will rarely be disturbed by a reviewing court."  Id. (quotation marks omitted).

As a result, severance claims are rarely hard to resolve – and the instant claim is even simpler than most.  This was an uncomplicated case involving property crimes easily understandable by jurors.  Further, any potential for prejudice in the case was further reduced by (1) the prosecution giving an opening statement providing jurors with a concise, linear outline of what the evidence would show,[39] (2) the prosecution presenting its case in a straightforward, logical fashion, (3) the prosecution succinctly summarizing the case in a closing argument which clearly walked jurors through the evidence presented at trial,[40] and (4) the trial judge carefully instructing the jurors as to the elements of each crime,[41] advising them that "[e]ach count and the evidence pertaining to it should be considered separately,"[42] and cautioning them to "keep in mind that you deliberate separately as to each of the verdicts."[43]  In light of those measures, it simply cannot be said that the state courts acted unreasonably in denying petitioner's claim.

---

[39] State Rec., Vols. 16 and 17 of 21, transcript of November 9, 2016, pp. 25-33.
[40] State Rec., Vol. 17 of 21, transcript of November 9, 2019, pp. 194-218.
[41] Id. at pp. 251-61.
[42] Id. at p. 244.
[43] Id. at p. 263.

### C.  Claims Concerning Trial Counsel

Petitioner asserts several claims concerning allegedly improper actions (and inactions) of his numerous attorneys.  He was initially represented in his criminal case by a succession of public defenders, namely Stella Cziment, James Brockway, and Jesse Beasley.  However, petitioner was ultimately appointed outside conflict counsel, Autumn Harrell.  Although he moved for Harrell's recusal and Harrell moved to withdraw, both of those motions were denied.   Therefore, much to his dismay, petitioner proceeded to trial with Harrell acting as his counsel.

### 1. Inadequate Consultation and Investigation

Petitioner faults all four of his attorneys for what he deemed to be inadequate consultation and investigation.  Specifically, he alleges:

- Cziment met with him only once for less than two minutes, telling him she did not have time to work on his case and would send law students to visit him.[44]

- Two students visited him a few days later, at which time he assigned them specific investigatory tasks.  Those tasks went uncompleted.[45]

- After Cziment withdrew, Brockway was appointed to represent him.  Brockway never met with him and did no investigation into the case.[46]

- Beasley was subsequently appointed to take over the defense.  Beasley did not visit with him and refused his telephone calls.[47]

---

[44] Rec. Doc. 1-1, p. 8.
[45] Id. at p. 9.
[46] Id. at p. 11.
[47] Id. at p. 15.

- Once Harrell was appointed to represent him, she met with him only once for "under 5 minutes" one day prior to voir dire, failed to consult with him, and did not investigate the case.[48]

Petitioner asserted claims of inadequate consultation and investigation on direct appeal; however, the Louisiana Fourth Circuit Court of Appeal declined to consider the claims, explaining that they should be asserted in post-conviction proceedings:

> Generally, ineffective-assistance-of-counsel claims are more properly raised in an application for post-conviction relief where the district court can conduct a full evidentiary hearing on the matter, if one is warranted. See State v. Leger, 05-0011, p. 44 (La. 7/10/06), 936 So.2d 108, 142; see also State v. Small, 13-1334, p. 13 (La. App. 4 Cir. 8/27/14), 147 So.3d 1274, 1283. Nevertheless, where the record contains evidence sufficient to decide the issue, and it is raised on appeal by an assignment of error, courts may consider the issue in the interest of judicial economy. See Leger, 05-0011, p. 44, 936 So.2d at 142.

> State v. Paulson, 15-0454, p. 9 (La. App. 4 Cir. 9/30/15), 177 So.3d 360, 367.
> In this case, Mr. Barker's claims that his counsel was ineffective in failing to investigate his case are indeterminable from the evidence contained in the record. His claims that he never received a visit from an attorney is contradicted by his admission that two law clerks visited him in an attempt to gather evidence. It is also evident from his counsel's own filings that Mr. Barker refused assistance of counsel at every juncture in this judicial proceeding.
> ….
> As we have already noted, "ineffective assistance of counsel claims are usually addressed in post-conviction proceedings, rather than on direct appeal ... [which] allows the trial court to conduct a full evidentiary hearing, if one is warranted." State v. Leger, 05-0011, p. 44 (La. 7/10/06), 936 So.2d 108, 142.
> ….
> Without more information on defense counsel's investigation into Mr. Barker's case, or lack thereof, … a claim of ineffective assistance of counsel in the instant case is not ripe for a full analysis on direct appeal.[49]

---

[48] Id. at pp. 22-24.
[49] State v. Barker, 317 So. 3d 422, 452-53 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.

When petitioner then reasserted the claims in the post-conviction proceedings, the state

district court denied the claims on the merits, holding:

> An ineffective assistance claim is assessed by the two prong test established in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). First, the defendant must show that counsel's performance was deficient, i.e. that he made mistakes that he was not functioning as the counsel guaranteed to a defendant by the Sixth Amendment. Secondly, one must show that the deficiency prejudiced him. This showing can only be made if the defendant can show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 693, 104 S. Ct. 2068.
>
> In its most recent filing, the State painstakingly reviewed the massive amount of evidence presented by the prosecution at Mr. Barker's trial and concluded that the result would have been the same, guilty verdicts on all counts, even if his attorney had not committed the errors he alleged. In particular, Mr. Barker complained that counsel failed to locate a homeless person, Mark Hale, who supposedly told Barker that one of the places he burglarized, Golean's Reception Hall, was a place he could squat in because of a hole in the wall. As the State points out in its response, even had Mr. Hale been located and testified as such, given that Barker was caught inside Golean's Reception Hall with the Hall's property and burglar tools in his backpack, a guilty verdict would surely have resulted.
>
> ….
>
> Finally, Barker faults his attorney for not obtaining surveillance footage or data from his computer to show that he was at a McDonald's restaurant at the time two of the charged offenses were committed. Other than this bald allegation, Barker has provided no evidence that supports this claim. Those crimes occurred more than four years ago, so the likelihood that any surveillance footage still exists in [sic] virtually nil. Moreover, at trial, the State presented credible eyewitness testimony and surveillance footage establishing Barker's presence at the crime scenes. Again, Barker's allegation lacks merit.[50]

On supervisory review, the Louisiana Fourth Circuit Court of Appeal then found "no error" in that

ruling,[51] and the Louisiana Supreme Court thereafter likewise denied relief, stating simply,

"Denied. Applicant fails to show that he received ineffective assistance of counsel under the

standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[52]

---

[50] State Rec., Vol. 21 of 21, Judgment dated February 10, 2020.

[51] State v. Barker, No. 2021-K-0161 (La. App. 4th Cir. Apr. 7, 2021); State Rec., Vol. 21 of 21.

[52] State v. Barker, 324 So. 3d 83 (La. 2021), reh'g refused, 328 So. 3d 78 (La. 2021); State Rec., Vol. 21 of 21.

To properly evaluate these claims on habeas review, this Court must first identify the controlling federal law. On even that most basic issue, the parties disagree. Respondent argues, and the state courts found, that petitioner's claims must be analyzed under the <u>Strickland</u> framework.

In <u>Strickland</u>, the United States Supreme Court held:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction … has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction … resulted from a breakdown in the adversary process that renders the result unreliable.

<u>Strickland</u>, 466 U.S. at 697.

When assessing whether counsel's performance was deficient under <u>Strickland</u>, a federal court must always be mindful that "<u>Strickland</u> does not guarantee perfect representation, only a reasonably competent attorney." <u>Harrington v. Richter</u>, 562 U.S. 86, 110 (2011). Therefore, "[t]o establish deficient performance, a person challenging a conviction must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 104 (quotation marks omitted). Moreover, the Supreme Court has cautioned:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong

> presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

Strickland, 466 U.S. at 689 (citations and quotation marks omitted).

Strickland's prejudice component is no less exacting. The Supreme Court has explained:

> In assessing prejudice under Strickland, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. Instead, Strickland asks whether it is reasonably likely the result would have been different. This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. The likelihood of a different result must be substantial, not just conceivable.

Richter, 562 U.S. at 111-12 (citations and quotation marks omitted).

Petitioner, however, contends that Strickland is not controlling here and argues that his claims should instead be analyzed under United States v. Cronic, 466 U.S. 648 (1984), and its progeny. Cronic, which was decided the same day as Strickland, held that where there has been a constructive denial of counsel (as opposed to merely ineffective assistance of counsel), a petitioner need not prove that actual prejudice resulted. The Supreme Court explained:

> There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.
> Most obvious, of course, is the complete denial of counsel. The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable. …
> Circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so

41

small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial.

<u>Cronic</u>, 466 U.S. at 658-60 (footnotes omitted).

However, <u>Cronic</u> was only a limited, rarely applicable exception to the more general <u>Strickland</u> rule.  As the United States Fifth Circuit Court of Appeals has observed:

A constructive denial of counsel occurs in only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was *in effect denied any meaningful assistance at all*.  The Supreme Court recently has emphasized that for <u>Cronic</u> to apply, "the attorney's failure must be *complete*."  <u>Bell v. Cone</u>, 535 U.S. 685, 122 S.Ct. 1843, 1851, 152 L.Ed.2d 914 (2002).  "For purposes of distinguishing between the rule of <u>Strickland</u> and that of <u>Cronic</u>," the Court held that a case does not come under <u>Cronic</u> merely because counsel failed to "oppose the prosecution ... at specific points" in the trial.  <u>Id.</u>  It is not enough for the defendant to show mere shoddy representation or to prove the existence of errors, omissions, or strategic blunders by counsel.  Bad lawyering, regardless of how bad, does not support the per se presumption of prejudice.

<u>Johnson v. Cockrell</u>, 301 F.3d 234, 238 (5th Cir. 2002) (citations, footnote, ellipsis, and brackets omitted).

And, in any event, it must be remembered that the question on habeas review is not whether this federal court believes that <u>Cronic</u> should apply – rather the question is **only** whether petitioner has shown that the state court's decision finding that <u>Strickland</u> (not <u>Cronic</u>) applies "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Here, petitioner cannot make that showing for a simple reason:  the United States Supreme Court has never held that <u>Cronic</u> applies to claims such as the ones asserted by him.  In light of that fact, his bid for review under <u>Cronic</u> must fail.  <u>See, e.g.</u>, <u>Woods v. Donald</u>, 575 U.S. 312, 317-19 (2015) (holding that "federal habeas relief based upon <u>Cronic</u> is unavailable" unless the United States Supreme Court has held

that "Cronic applies to the circumstances presented in th[e] case"); Wright v. Van Patten, 552 U.S. 120, 125-26 (2008) ("No decision of this Court, however, squarely addresses the issue in this case or clearly establishes that Cronic should replace Strickland in this novel factual context. … Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, 'it cannot be said that the state court "unreasonabl[y] appli[ed] clearly established Federal law.'" Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." (citations omitted)).

Accordingly, for the foregoing reasons, petitioner's claims must be analyzed under Strickland, **not** Cronic. And, for the following reasons, they fail under Strickland.

As noted, petitioner alleges that all his attorneys over the course of the proceedings were ineffective because they failed to meet with him, consult with him, or pursue the avenues for investigation he wanted them to explore. However, although counsel should make efforts to meet and consult with a client, "brevity of consultation time between a defendant and his counsel, alone, cannot support a claim of ineffective assistance of counsel." Murray v. Maggio, 736 F.2d 279, 282 (5th Cir. 1984); accord Schwander v. Blackburn, 750 F.2d 494, 499-500 (5th Cir. 1985); Schwertz v. Cain, Civ. Action Nos. 12-1897 and 12-2142, 2012 WL 5956308, at *13 (E.D. La. Nov. 13, 2012) ("To the extent that petitioner is contending that counsel failed to meet with him sufficiently or failed to abide by the professional rules of conduct concerning communication between an attorney and his client, that alone would not warrant relief under the Sixth Amendment."), adopted, 2012 WL 5949516 (E.D. La. Nov. 28, 2012). Rather, a claim of brief or otherwise inadequate consultation rises to the level of ineffective assistance only if **prejudice** actually resulted. See, e.g., Murray, 736 F.2d at 283; Schwertz, 2012 WL 5956308, at *13.

Similarly, it is well established that trial counsel "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." Strickland, 466 U.S. at 691. But, again, actual **prejudice** is an indispensable component of such a claim. See Brown v. Dretke, 419 F.3d 365, 375 (5th Cir. 2005); Wilson v. Cain, Civ. Action No. 06-890, 2009 WL 2163124, at *22 (E.D. La. July 16, 2009), aff'd, 641 F.3d 96 (5th Cir. 2011).

Further, to prevail on such claims on federal habeas review, petitioner must additionally establish that the state court's decision finding that he suffered no prejudice was unreasonable. As the United States Fifth Circuit Court of Appeals has explained:

> The Supreme Court standard on prejudice is sharply defined: "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." [A petitioner] must show it was "reasonably likely" the jury *would* have reached a different result, not merely that it *could* have reached a different result. The Court reaffirmed this point in Richter: "The likelihood of a different result must be substantial, not just conceivable."
> Now layer on top of that the habeas lens of *reasonableness*. Because the state court has already adjudicated [the petitioner's] ineffective-assistance claim on the merits, he must show that the court's no-prejudice decision is "not only incorrect but 'objectively unreasonable.'" Put differently, [he] must show that every reasonable jurist would conclude that it is reasonabl[y] likely that [he] would have fared better at trial had his counsel conducted a sufficient pretrial investigation. "It bears repeating," the Supreme Court emphasized in Richter, "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable."

Adekeye v. Davis, 938 F.3d 678, 683-84 (5th Cir. 2019) (emphasis added; footnotes omitted).

And how does he establish that actual prejudice resulted? He does so by pointing to the actual beneficial evidence that would have resulted from additional visits by and consultation with his attorneys or from a more thorough investigation by them. But, here, petitioner produced no such evidence – he merely offered uncorroborated, self-serving allegations that it existed. That simply does not suffice.

An example:  Petitioner alleges that if his attorneys had consulted with him and followed up with adequate investigations, they would have discovered that there was exculpatory evidence, such as video from McDonald's showing that he was at that restaurant at the time of the crimes. But the critical flaw is that petitioner has failed to prove that such a video (or any other supposedly beneficial evidence) actually existed, was in fact exculpatory, and would have been discoverable upon further investigation.  Because he has presented only allegations without supporting proof, his claim fails.   See, e.g., Maricle v. Tanner, Civ. Action No. 16-1540, 2017 WL 2373238, at *7 (E.D. La. Mar. 10, 2017) (rejecting claim because petitioner "present[ed] only self-serving allegation[s] in support of his contention that counsel was ineffective for failing to adequately investigate his case to uncover evidence" and "present[ed] no objective evidence at all to establish either that his counsel in fact failed to conduct a proper investigation or that any evidence of … a defense … actually existed which could have been discovered through further investigation"), adopted, 2017 WL 2364275 (E.D. La. May 31, 2017); Green v. Vannoy, Civ. Action No. 15-915, 2016 WL 6477041, at *9 (E.D. La. May 24, 2016) ("With respect to petitioner's final contention that his counsel was ineffective for failing to adequately investigate his case to uncover and present evidence of his 'actual innocence,' that claim is likewise meritless.  Here, petitioner presented no evidence whatsoever at the evidentiary hearing establishing *either* that his counsel in fact failed to conduct a proper investigation *or* that any evidence of his innocence actually existed which could have been discovered through further investigation.  A petitioner does not meet his burden of proof by presenting nothing more than his own unsupported, self-serving allegations that his counsel was ineffective."), adopted, 2016 WL 6441275 (E.D. La. Nov. 1, 2016); Kron v. Tanner, Civ. Action No. 09-7572, 2010 WL 3470465, at *2 (E.D. La. Aug. 30, 2010) ("Kron claims his

attorney's investigation was inadequate in that his attorney failed to obtain a surveillance tape. Kron, however, has failed to establish that such a videotape even existed, must less that it would have exonerated him.").

Another example: Petitioner alleges that had his attorneys consulted with him and followed up with adequate investigations, they would have discovered that there were individuals who could have provided exculpatory testimony. However, again, he has not produced any evidence showing that the individuals actually existed, that they were discoverable, or that they would in fact have benefited the defense. And, again, those are things that he must **prove** – without supporting evidence, courts cannot simply take him at his word. As the United States Fifth Circuit Court of Appeals explained with respect to analogous claims of uncalled witnesses:

> [W]e require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by naming the witness, demonstrating that the witness was available to testify and would have done so, setting out the content of the witness's proposed testimony, and showing that the testimony would have been favorable to a particular defense.

Woodfox v. Cain, 609 F.3d 774, 808 (5th Cir. 2010) (citations, quotation marks, and brackets omitted); see also Hooks v. Thaler, 394 F. App'x 79, 83 (5th Cir. 2010) ("[T]he seemingly technical requirements of affirmatively showing availability and willingness to testify '[are] not a matter of formalism.'" (quoting Woodfox, 609 F.3d at 808)). To meet that burden of proof, a petitioner must come forward with actual evidence, such as affidavits from the individuals. See, e.g., Cox v. Stephens, 602 F. App'x 141, 146 (5th Cir. 2015) (rejecting claim that counsel was ineffective for failing to call witnesses at trial, noting, "Cox has failed, through affidavits or otherwise, to demonstrate that these witnesses would have testified; identify the content of their testimony; or support that their testimony would have been favorable"); Kron, 2010 WL 3470465,

at *2 ("Kron alleges counsel failed to interview exculpatory witnesses. Again, Kron failed to provide any supporting evidence, such as affidavits from the potential witnesses, showing that those individuals would have testified at trial and that their testimony would have been favorable to the defense."); <u>Anthony v. Cain</u>, Civ. Action No. 07-3223, 2009 WL 3564827, at *8 (E.D. La. Oct. 29, 2009) ("This Court may not speculate as to how such witnesses would have testified; rather, a petitioner must come forward with evidence, such as affidavits from the uncalled witnesses, on that issue."); <u>Combs v. United States</u>, Nos. 3:08-CV-0032 and 3:03-CR-0188, 2009 WL 2151844, at *10 (N.D. Tex. July 10, 2009) ("Unless the movant provides the court with affidavits, or similar matter, from the alleged favorable witnesses suggesting what they would have testified to, claims of ineffective assistance of counsel fail for lack of prejudice."); <u>Harris v. Director, TDCJ-CID</u>, No. 6:06cv490, 2009 WL 1421171, at *7 (E.D. Tex. May 20, 2009) ("Failure to produce an affidavit (or similar evidentiary support) from the uncalled witness is fatal to the claim of ineffective assistance.").

Simply put: "[b]are allegations … are insufficient," <u>Cox</u>, 602 F. App'x at 146 (5th Cir. 2015), and those put forth here should therefore be denied.

## 2. Conflict of Interest

After Harrell was appointed to represent him in his criminal proceeding, petitioner promptly added her as a defendant in a civil lawsuit he filed. On direct appeal, the Louisiana Fourth Circuit Court of Appeal opined that the action was simply another of his transparent attempts to manipulate the criminal proceedings, stating:

> Mr. Barker's *pro se* supplemental brief, taken as a whole, appears to corroborate the notion that he attempted to fabricate a conflict of interest by suing the judge and his attorney, and then attempted to use that spurious conflict of interest to avoid prosecution (evidenced by his motion to halt prosecution and motions to quash); to

avoid conviction (evidenced by his attempts to influence the jury, his motions for recusal, mistrial, etc.); and to avoid incarceration (evidenced by his allegations of bias, revenge, and sabotage – caused by the conflict of interest – as the basis for nearly all of his assignments of error). The record also indicates indicate [sic] that Mr. Barker sabotaged his own defense to bolster his claim that his rights were violated as a victim of the OPD funding "crisis." (Mr. Barker filed a pro se motion to dismiss his initial public defender on 8/25/15, just eleven days after he was appointed, claiming the OPD funding crisis precluded his effective representation).[53]

As noted, petitioner filed with the Louisiana Supreme Court a writ application challenging the Court of Appeal's direct-review judgment; however, the Louisiana Supreme Court summarily denied that application.[54]

The United States Constitution does not require that such maneuvers be countenanced. On the contrary, as former United States Magistrate Judge Sally Shushan explained in a Report and Recommendation adopted by the district court:

> A criminal defendant is not entitled to a new lawyer simply because he has sued his current one. Such a *per se* rule is not required by the Sixth Amendment. Moreover, such a rule would be undesirable and unworkable, because it would in effect give a defendant the ability to veto the trial court's appointment of counsel. Where an actual conflict exists, then new counsel should of course be appointed; however, a defendant is not entitled to game the system by manufacturing a false conflict because he does not like his lawyer.

Everett v. Louisiana, Civ. Action No. 08-4745, 2009 WL 1971370, at *8 (E.D. La. July 7, 2009) (citations omitted); accord Smith v. Lockhart, 923 F.2d 1314, 1321 n.11 (8th Cir. 1991) ("We recognize the danger of any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys. A patently frivolous lawsuit brought by a defendant against his or her counsel may not, alone, constitute cause for appointment of new counsel. Trial

---

[53] State v. Barker, 317 So. 3d 422, 461 n.32 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.
[54] State v. Barker, 267 So. 3d 85 (La. 2019), reh'g refused, 278 So. 3d 361 (La. 2019); State Rec., Vol. 21 of 21.

judges must be wary of defendants who employ complaints about counsel as dilatory tactics or for some other invidious motive." (citations omitted)); <u>Peck v. Williams</u>, Case No. 2:17-cv-01620, 2020 WL 641529, at *1 (D. Nev. Feb. 11, 2020) ("[T]he law does not allow a party to manufacture a conflict and use it as a basis to remove a lawyer or judge from his case."), <u>appeal dismissed</u>, No. 20-15333, 2020 WL 2791792 (9th Cir. Mar. 26, 2020); <u>Voight v. Gipson</u>, No. SACV 12-1231, 2014 WL 1779816, at *32 (C.D. Cal. Apr. 30, 2014) ("[A] petitioner may not 'manufacture' a conflict by suing his counsel while his case is pending.").

That is consistent with United States Supreme Court jurisprudence.  For example, the Supreme Court has held:  "[T]he **possibility** of conflict is insufficient to impugn a criminal conviction.  In order to demonstrate a violation of his Sixth Amendment rights, a defendant must establish that an **actual** conflict of interest adversely affected his lawyer's performance." <u>Cuyler v. Sullivan</u>, 446 U.S. 335, 350 (1980) (emphasis added).  And "an actual conflict of interest" is "a conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties." <u>Mickens v. Taylor</u>, 535 U.S. 162, 171 (2002).

Here, petitioner has failed to show that the existence of his civil lawsuit in fact adversely affected his representation by Harrell.

Moreover, in any event, the AEDPA's stringently deferential standards of review independently doom petitioner's claim.  As already explained herein, for habeas relief to be warranted with respect to a claim denied on the merits in state court, petitioner must establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Here, petitioner cannot make that showing because the United States Supreme Court

has never held that a defendant must be appointed new counsel when he attempts to manufacture

a conflict of interest by suing his defense counsel in a civil lawsuit.   And as already explained

*supra*:  when the Supreme Court's "cases give no clear answer to the question presented, let alone

one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly

established Federal law."   <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) (quotation marks and

brackets omitted).

### 3. Concession of Guilt

Lastly, petitioner claims that Harrell was ineffective for conceding his guilt to the jury.[55]

He first asserted that claim on direct appeal.  Regarding the claim, the Louisiana Fourth Circuit

Court of Appeal observed:

> We note that defense counsel advised the jurors during opening statement that they should return "mostly not guilty" verdicts except for "possibly criminal trespass for Dublin"; she explained to the jury that she was "being honest" with them.  <u>See</u> <u>State v. Hoffman</u>, 98-3118, pp. 39-40 (La. 4/11/00), 768 So.2d 542, 578-79 (conceding the defendant's involvement may constitute a defense strategy to establish candor with the jury in the hopes of gaining credibility, where the Court noted that it does "'not sit to second-guess strategic and tactical choices made by trial counsel.'").  We note though, that Mr. Barker, too, made an inherent admission of guilt when he stated to the jury in his pro se opening statement:  "I'm not going to deny that.  I was caught inside of the building that they were talking about."
>
> We are aware of the recent United State Supreme Court decision of <u>McCoy v. La.</u>, 584 U.S. ——, 138 S.Ct. 1500, 1505-07, 200 L.Ed.2d 821 (2018) which considered whether the defense counsel's admission of guilt over a defendant's objection was unconstitutional.[FN 27]   The Supreme Court, noting that the defendant opposed his counsel's "assertion of his guilt at every opportunity, before and during trial, both in conference with his lawyer and in open court" and "vociferously insisted on his innocence and adamantly objected to any admission of guilt" held:
>
> > ... that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the

---

[55] Rec. Doc. 1-1, pp. 27-30.

> death penalty.  Guaranteeing a defendant the right "to have the Assistance of Counsel for his defence," the Sixth Amendment so demands.  With individual liberty – and, in capital cases, life – at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense:  to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

> Id., 138 S.Ct. at 1505-06.  The McCoy Court also remarked that, when "a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." Id., 138 S.Ct. at 1509-10.

>> [FN 27]  In McCoy, the defendant's counsel made a tactical decision to admit the defendant's guilt of the three murders, and "urged mercy in view of [his] 'serious mental and emotional issues.'"[56]

Ultimately, however, the Court of Appeal concluded that the claim was "not ripe for a full analysis on direct appeal."[57]

Petitioner therefore reasserted the claim in the post-conviction proceedings.  The state district court then denied the claim, stating:

> Barker's allegation that counsel failed him in closing argument has no merit.  When counsel argued to the jury that they should find him "mostly not guilty," that was a reasonable trial strategy in that she was seeking convictions on misdemeanor responsive verdicts.  She knew that a felony conviction would result in a multiple offender adjudication and a very lengthy jail sentence, so she urged the jury to instead convict him on lesser included responsive verdicts on counts where the evidence was simply overwhelming.  This sound trial strategy, while ultimately unsuccessful, is not a basis for relief under Strickland.[58]

On supervisory review, the Louisiana Fourth Circuit Court of Appeal found "no error" in that ruling,[59] and the Louisiana Supreme Court likewise denied relief, stating simply, "Denied.

---

[56] State v. Barker, 317 So. 3d 422, 452-53 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.
[57] Id. at 453.
[58] State Rec., Vol. 21 of 21, Judgment dated February 10, 2020.
[59] State v. Barker, No. 2021-K-0161 (La. App. 4th Cir. Apr. 7, 2021); State Rec., Vol. 21 of 21.

Applicant fails to show that he received ineffective assistance of counsel under the standard of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)."[60]

Petitioner once again argues that the state courts erred by considering his claim under the Strickland framework. This time, however, his argument is that the claim should instead have been analyzed under McCoy v. Louisiana, 138 S. Ct. 1500 (2018).[61]

In McCoy, the United States Supreme Court explained:

In Florida v. Nixon, 543 U.S. 175, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004), this Court considered whether the Constitution bars defense counsel from conceding a capital defendant's guilt at trial "when [the] defendant, informed by counsel, neither consents nor objects," id., at 178, 125 S.Ct. 551. In that case, defense counsel had several times explained to the defendant a proposed guilt-phase concession strategy, but the defendant was unresponsive. Id., at 186, 125 S.Ct. 551. We held that when counsel confers with the defendant and the defendant remains silent, neither approving nor protesting counsel's proposed concession strategy, id., at 181, 125 S.Ct. 551, "[no] blanket rule demand[s] the defendant's explicit consent" to implementation of that strategy, id., at 192, 125 S.Ct. 551.

In the case now before us, in contrast to Nixon, the defendant vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. Yet the trial court permitted counsel, at the guilt phase of a capital trial, to tell the jury the defendant "committed three murders.... [H]e's guilty." We hold that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty. Guaranteeing a defendant the right "to have the Assistance of Counsel for *his* defence," the Sixth Amendment so demands. With individual liberty – and, in capital cases, life – at stake, it is the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt.

---

[60] State v. Barker, 324 So. 3d 83 (La. 2021), reh'g refused, 328 So. 3d 78 (La. 2021); State Rec., Vol. 21 of 21.
[61] See Rec. Doc. 1-1, pp. 27-30.

McCoy, 138 S. Ct. at 1505 (record citations omitted).  The Supreme Court further opined that a

defendant's acceptance of representation by counsel does not cede to counsel the authority to make

all decisions in the case, explaining:

> The choice is not all or nothing:  To gain assistance, a defendant need not
> surrender control entirely to counsel.  For the Sixth Amendment, in "grant[ing] to
> the accused personally the right to make his defense," "speaks of the 'assistance'
> of counsel, and an assistant, however expert, is still an assistant."  Faretta [v.
> California], 422 U.S. [806,] 819-820, 95 S.Ct. 2525[, 45 L.Ed.2d 562 (1975)]; see
> Gannett Co. v. DePasquale, 443 U.S. 368, 382, n. 10, 99 S.Ct. 2898, 61 L.Ed.2d
> 608 (1979) (the Sixth Amendment "contemplat[es] a norm in which the accused,
> and not a lawyer, is master of his own defense").  Trial management is the lawyer's
> province:  Counsel provides his or her assistance by making decisions such as "what
> arguments to pursue, what evidentiary objections to raise, and what agreements to
> conclude regarding the admission of evidence."  Gonzalez v. United States, 553
> U.S. 242, 248, 128 S.Ct. 1765, 170 L.Ed.2d 616 (2008) (internal quotation marks
> and citations omitted).  Some decisions, however, are reserved for the client –
> notably, whether to plead guilty, waive the right to a jury trial, testify in one's own
> behalf, and forgo an appeal.  See Jones v. Barnes, 463 U.S. 745, 751, 103 S.Ct.
> 3308, 77 L.Ed.2d 987 (1983).
>
> Autonomy to decide that the objective of the defense is to assert innocence
> belongs in this latter category.  Just as a defendant may steadfastly refuse to plead
> guilty in the face of overwhelming evidence against her, or reject the assistance of
> legal counsel despite the defendant's own inexperience and lack of professional
> qualifications, so may she insist on maintaining her innocence at the guilt phase of
> a capital trial.  These are not strategic choices about how best to *achieve* a client's
> objectives; they are choices about what the client's objectives in fact *are*.  See
> Weaver v. Massachusetts, 582 U.S. ——, ——, 137 S.Ct. 1899, 1908, 198 L.Ed.2d
> 420 (2017) (self-representation will often increase the likelihood of an unfavorable
> outcome but "is based on the fundamental legal principle that a defendant must be
> allowed to make his own choices about the proper way to protect his own liberty");
> Martinez v. Court of Appeal of Cal., Fourth Appellate Dist., 528 U.S. 152, 165, 120
> S.Ct. 684, 145 L.Ed.2d 597 (2000) (Scalia, J., concurring in judgment) ("Our
> system of laws generally presumes that the criminal defendant, after being fully
> informed, knows his own best interests and does not need them dictated by the
> State.").

Id. at 1508.  The Supreme Court then concluded:

> When a client expressly asserts that the objective of "*his* defence" is to maintain
> innocence of the charged criminal acts, his lawyer must abide by that objective and
> may not override it by conceding guilt.  U.S. Const. Amdt. 6 (emphasis added); see

ABA Model Rule of Professional Conduct 1.2(a) (2016) (a "lawyer shall abide by a client's decisions concerning the objectives of the representation").

Id. at 1509.

In so concluding, the Supreme Court held that Strickland does not govern such claims, explaining:

> Because a client's autonomy, not counsel's competence, is in issue, we do not apply our ineffective-assistance-of-counsel jurisprudence, Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), or United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984), to McCoy's claim. To gain redress for attorney error, a defendant ordinarily must show prejudice. See Strickland, 466 U.S., at 692, 104 S.Ct. 2052. Here, however, the violation of McCoy's protected autonomy right was complete when the court allowed counsel to usurp control of an issue within McCoy's sole prerogative.
>
> Violation of a defendant's Sixth Amendment-secured autonomy ranks as error of the kind our decisions have called "structural"; when present, such an error is not subject to harmless-error review. See, e.g., McKaskle [v. Wiggins], 465 U.S. [168,] 177, n. 8, 104 S.Ct. 944[, 79 L.Ed.2d 122 (1984)] (harmless-error analysis is inapplicable to deprivations of the self-representation right, because "[t]he right is either respected or denied; its deprivation cannot be harmless"); United States v. Gonzalez-Lopez, 548 U.S. 140, 150, 126 S.Ct. 2557, 165 L.Ed.2d 409 (2006) (choice of counsel is structural); Waller v. Georgia, 467 U.S. 39, 49-50, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (public trial is structural). Structural error "affect[s] the framework within which the trial proceeds," as distinguished from a lapse or flaw that is "simply an error in the trial process itself." Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). An error may be ranked structural, we have explained, "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest," such as "the fundamental legal principle that a defendant must be allowed to make his own choices about the proper way to protect his own liberty." Weaver, 582 U.S., at ——, 137 S.Ct., at 1908 (citing Faretta, 422 U.S., at 834, 95 S.Ct. 2525). An error might also count as structural when its effects are too hard to measure, as is true of the right to counsel of choice, or where the error will inevitably signal fundamental unfairness, as we have said of a judge's failure to tell the jury that it may not convict unless it finds the defendant's guilt beyond a reasonable doubt. 582 U.S., at —— - ——, 137 S.Ct., at 1908 (citing Gonzalez-Lopez, 548 U.S., at 149, n. 4, 126 S.Ct. 2557, and Sullivan v. Louisiana, 508 U.S. 275, 279, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993)).
>
> Under at least the first two rationales, counsel's admission of a client's guilt over the client's express objection is error structural in kind. See Cooke [v. State], 977 A.2d [803,] 849 [(Del. 2009)] ("Counsel's override negated Cooke's decisions

> regarding his constitutional rights, and created a structural defect in the proceedings as a whole."). Such an admission blocks the defendant's right to make the fundamental choices about his own defense. And the effects of the admission would be immeasurable, because a jury would almost certainly be swayed by a lawyer's concession of his client's guilt. McCoy must therefore be accorded a new trial without any need first to show prejudice.

Id. at 1510-11 (record citations omitted).

To determine what extent, if any, McCoy is controlling in the instant case, this Court must first examine what actually occurred at petitioner's trial. The transcript reflects that Harrell did, in fact, make certain concessions concerning the incident at 3207 Dublin Street ("Golean's"). In her opening statement, she stated:

> I believe that if you listen to the facts you will come back with mostly not guilty. I don't think that you will be able to come back with anything less than possibly criminal trespass for Dublin because I'm being honest with you on that, but I think that is the worst he has done here.[62]

She then made similar comments in her closing argument. For example, she stated: "Now, when we talked before we talked about the Dublin location and, as I had said in opening, I am not going to try to get around it. He is caught red handed in there. You-all saw it on the video. He was caught red handed there ...."[63] She then concluded by saying:

> What I would ask you to do is to listen to the evidence presented, which led to a whole bunch of assumptions and conclusions, and I want you to consider the lack of evidence that actually was presented and **I'm going to ask you to come back with not guilty on all counts. If you feel there is a count he should come back guilty for, the Dublin house and the entry of criminal trespass is the only one I find that would be appropriate.** I ask you to weigh the evidence considerably and return a verdict that is just.[64]

---

[62] State Rec., Vol. 16 of 21, transcript of November 9, 2016, pp. 35-36.
[63] State Rec., Vol. 17 of 21, transcript of November 9, 2016, p. 224.
[64] Id. at p. 227 (emphasis added).

Therefore, Harrell conceded that petitioner was inside Golean's and that, at worst, the jury might therefore conclude that he had committed criminal trespass as to Golean's. But petitioner was not charged with criminal trespass. Rather, the Bill of Information[65] reflects that, with respect to the incident at Golean's, he was charged with simple burglary and simple criminal damage to property.

That poses an initial problem for petitioner's <u>McCoy</u> argument. With respect to those charges, it is true that the prosecution was required to show that petitioner was present at Golean's – **but** his presence **alone** would not be sufficient to render him guilty of either of the charged crimes. Simple burglary required the state to prove additional elements,[66] and the same was true of simple damage to property.[67]    Therefore, Harrell's statements were not tantamount to concessions that he was guilty of the charged crimes, and courts have found that <u>McCoy</u> is not triggered by partial concessions. See, e.g., <u>United States v. Rosemond</u>, 958 F.3d 111, 122-23 (2nd Cir. 2020) ("Throughout its opinion, the <u>McCoy</u> Court's use of the word 'guilt' is explicitly limited to the **charged** crime. … **Conceding an element of a crime while contesting the other elements falls within the ambit of trial strategy**. … Thus, we hold that <u>McCoy</u> is limited to a defendant's

---

[65] State Rec., Vol. 2 of 21, Bill of Information.

[66] "Simple burglary is the unauthorized entering of any dwelling, vehicle, watercraft, or other structure, movable or immovable, or any cemetery, **with the intent to commit a felony or any theft therein**, other than as set forth in R.S. 14:60." La. Rev. Stat. Ann. § 62(A) (emphasis added).

[67] Louisiana law defines simple criminal damage to property as:

> (1) Simple criminal damage to property is the **intentional damaging of any property** of another, without the consent of the owner, and except as provided in R.S. 14:55, by any means other than fire or explosion.
> (2) The provisions of this Section shall include the intentional damaging of a dwelling, house, apartment, or other structure used in whole or in part as a home, residence, or place of abode by a person who leased or rented the property.

La. Rev. Stat. Ann. § 56(A) (emphasis added).

right to maintain his innocence of the **charged** crimes." (emphasis added)), <u>cert. denied</u>, 141 S. Ct. 1057 (2021); <u>see also</u> <u>United States v. Wilson</u>, 960 F.3d 136, 144 (3rd Cir. 2020) ("[W]hether to contest or concede a jurisdictional element is a tactical decision reserved for counsel, not defendants. … **[F]ailure to consult with the defendant on the stipulation or to heed his instruction to contest a jurisdictional element, while perhaps ethically worrisome, is not structural error**." (emphasis added)), <u>cert. denied</u>, 141 S. Ct. 1090 (2020) and 141 S. Ct. 1091 (2020).  That is true even if the concession had the effect of conceding that the petitioner was guilty of a different, **uncharged** crime.  <u>See</u> <u>Rosemond</u>, 958 F.3d at 123 ("While it is true that [defense counsel] admitted that [defendant] committed *a* crime – perhaps aiding and abetting an assault in the first-degree … or conspiring to commit a kidnapping … – he vehemently denied that [defendant] committed the **charged** crime.  Although there may be times where such a concession could expose a defendant to additional, future criminal liability, there is no indication that that was the case here.  Moreover, … we read <u>McCoy</u> as limited to a defendant preventing his attorney from admitting he is guilty of the crime with which he is **charged**." (boldface emphasis added)).

Of course, it might be argued that the instant case comes closer to crossing the impermissible line given that, although criminal trespass was not a **charged** offense, the trial judge instructed the jurors that they **could** return a verdict "guilty of criminal trespass" on the simple burglary charge because it was a lesser responsive offense.[68]  However, that argument still would not carry the day for two reasons.

---

[68] State Rec., Vol. 17 of 21, transcript of November 9, 2016, p. 247-48.  It appears that instruction may have been improper.  <u>See</u> <u>State v. Major</u>, 597 So. 2d 108, 109 (La. App. 4th Cir. 1992) ("L.C.Cr.P. art. 814 sets forth the responsive verdicts to simple burglary.  They are: guilty, guilty of attempted simple burglary, guilty of unauthorized entry of a place of business, and guilty of attempted unauthorized entry of a place of business. Criminal trespass is not a responsive verdict to simple burglary. … When responsive verdicts are mandated by Article 814, as they are in this case, the trial court is without authority to alter or add to the legislatively prescribed responsive verdicts. (citations

First, the United States Supreme Court has never addressed the question of whether <u>McCoy</u> applies where counsel did not concede guilt of a charged offense but instead conceded guilt only of a lesser included misdemeanor offense. Because the Supreme Court has never answered that question, the state court's decision that <u>Strickland</u> (rather than <u>McCoy</u>) applies would not warrant federal habeas relief. <u>See</u> <u>Wright v. Van Patten</u>, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law. Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." (citation, quotation marks, and brackets omitted)).

Second, in any event, Harrell made clear in her closing argument that she was not expressly conceding that petitioner **was** guilty of criminal trespass. Instead, she was arguing that **if** the jury determined that he was guilty of **anything**, it could be **nothing more** than criminal trespass. But to be guilty of even the lesser offense of criminal trespass, petitioner had to have entered Golean's "**without** express, legal, or implied **authorization**." La. Rev. Stat. Ann. § 14:63 (A) (emphasis added). Harrell conceded only that petitioner was inside Golean's; she did not concede that he was inside **without authorization**.

And, lastly, even aside from all of the foregoing, <u>McCoy</u> would not apply for another reason: <u>McCoy</u> applies only when counsel overrides her client's **express** instruction not to make a concession. <u>McCoy</u>, 138 S. Ct. at 1509 ("Presented with **express** statements of the client's will to maintain innocence, … counsel may not steer the ship the other way." (emphasis added)) and

---

omitted)); <u>see also</u> <u>State v. Thomas</u>, 102 So. 3d 244, 246 (La. App. 4th Cir. 2012) ("Several Louisiana appellate courts have held that criminal trespass is not a responsive verdict to a charge of simple burglary.").

1512 ("The trial court's allowance of [defense counsel's] admission of McCoy's guilt despite McCoy's **insistent objections** was incompatible with the Sixth Amendment." (emphasis added)); see also Gonzalez v. Lumpkin, Civ. Action No. 1:20-cv-190, 2022 WL 509038, at *8 (S.D. Tex. Jan. 28, 2022) ("[T]he Sixth Amendment is not violated if the client never disavows or protests a lawyer's decision to strategically admit guilt. Florida v. Nixon, 543 U.S. 175, 188, 125 S.Ct. 551, 160 L.Ed.2d 565 (2004). Thus, the Sixth Amendment is violated only when the defendant specifically instructs counsel not to concede any portion of guilt and counsel disregards the client's wishes."), adopted, 2022 WL 1063614 (S.D. Tex. Apr. 8, 2022). There is no evidence that petitioner expressly instructed Harrell not to concede that he entered Golean's. On the contrary, it must be noted that petitioner himself made the **same** concession in his own pro se opening statement, saying, "I'm not going to deny that. I was caught inside of the building that they were talking about, Golean's Hall."[69]

For all of these reasons, this Court should reject petitioner's argument that McCoy is controlling. Rather, this Court, like the state courts, should find that Strickland controls. And, under Strickland, Harrell's concession that petitioner was inside Golean's did not rise to the level of deficient performance.

In the first place, Harrell's concession was a tactical decision to build credibility with the jury – and counsel generally has the authority to make such tactical decisions. See, e.g., Taylor v. Illinois, 484 U.S. 400, 417-18 (1988) ("Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has – and must have – full authority to manage the conduct of the trial. The adversary process could

---

[69] State Rec., Vol. 16 of 21, transcript of November 9, 2016, p. 36.

not function effectively if every tactical decision required client approval." (footnote omitted)). Moreover, "[t]here is a strong presumption that defense counsel's strategic and tactical decisions are within the wide range of reasonable professional assistance." Thomas v. Lumpkin, 995 F.3d 432, 441 (5th Cir. 2021). Here, petitioner has not overcome that presumption.

In any event, petitioner's claim fails for another reason: he suffered no prejudice from the concession. Video surveillance footage showed petitioner in Golean's, that footage was introduced at trial, and, as noted, petitioner conceded he was inside the building in his opening statement. Therefore, Harrell merely conceded a fact that was easily provable – **and in fact proved** – at trial. Accordingly, the concession was of no consequence.

In summary: To be entitled to relief, petitioner must demonstrate that the state court decision denying his ineffective assistance of counsel claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States. He has not done so. As a result, this Court should likewise deny relief.

### D. Claims Alleging Judicial Bias

Petitioner's criminal case was originally allotted to Section C of the Orleans Parish Criminal District Court, with Judge Benedict Willard presiding. Over the course of the proceedings, petitioner filed a civil lawsuit, naming Judge Willard as a defendant. Judge Willard then recused himself from petitioner's criminal case,[70] and the matter was reallotted to Section I, with Judge Karen Herman presiding. However, Judge Herman then ruled that the recusal was improper and transferred the case back to Judge Willard.[71] Judge Willard thereafter again recused

---

[70] State Rec., Vol. 12 of 21, minute entry dated April 15, 2016.
[71] State Rec., Vol. 12 of 21, minute entry dated April 27, 2016.

himself and transferred the case back to Judge Herman.[72]  Petitioner then added Judge Herman as

a defendant in the civil lawsuit and moved for Judge Herman's recusal, but that motion was denied.

Eventually, petitioner proceeded to trial before Judge Herman.

In this federal proceeding, petitioner argues that he is entitled to relief because Judge

Herman was biased against him.  Regarding such claims of bias, the United States Fifth Circuit

Court of Appeals has explained:

> Under the Due Process Clause, a criminal defendant is guaranteed the right to a fair and impartial tribunal.  Bracy v. Gramley, 520 U.S. 899, 117 S.Ct. 1793, 1797, 138 L.Ed.2d 97 (1997).  The Due Process Clause "establishes a constitutional floor, not a uniform standard."  Id.  This floor requires a fair trial, "before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  Id. (citation omitted).
>
> However, "bias by an adjudicator is not lightly established."  Valley v. Rapides Parish Sch. Bd., 118 F.3d 1047, 1052 (5th Cir. 1997).  Courts ordinarily "presume that public officials have properly discharged their official duties."  Bracy v. Gramley, 117 S.Ct. at 1799 (internal quotation marks and citations omitted).  General allegations of bias or prejudice are insufficient to establish a constitutional violation.  See Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 106 S.Ct. 1580, 1585, 89 L.Ed.2d 823 (1986) (holding that general allegations of a judge's frustration with insurance companies are not sufficient to force recusal under the Due Process Clause from a case in which an insurance company was a party).  The Supreme Court has stated that "most matters relating to judicial disqualification [do] not rise to a constitutional level."  Id. at 1584 (quoting FTC v. Cement Inst., 333 U.S. 683, 68 S.Ct. 793, 804, 92 L.Ed. 1010 (1948)).  So even if a judge is disqualified under state or federal law, the disqualification is not always required by the Due Process Clause.  See id. at 1585.
>
> In general, the Supreme Court has recognized "presumptive bias" as the one type of judicial bias other than actual bias that requires recusal under the Due Process Clause.  Buntion [v. Quarterman], 524 F.3d [664,] 672 [(5th Cir. 2008)].  Presumptive bias occurs when a judge may not actually be biased, but has the appearance of bias such that "the probability of actual bias ... is too high to be constitutionally tolerable."  Id. (quoting Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 1464, 43 L.Ed.2d 712 (1975)).  The Supreme Court has only found that a judge's failure to recuse constitutes presumptive bias in three situations:  (1) when the judge "has a direct personal, substantial, and pecuniary interest in the outcome of the case," (2) when he "has been the target of personal abuse or criticism from

---

[72] State Rec., Vol. 12 of 21, minute entry dated May 4, 2016.

the party before him," and (3) when he "has the dual role of investigating and adjudicating disputes and complaints." Buntion, 524 F.3d at 672 (quoting Bigby v. Dretke, 402 F.3d 551, 559 (5th Cir. 2005)); see also Crater v. Galaza, 491 F.3d 1119, 1131 (9th Cir. 2007) (coming to the same conclusion).

Richardson v. Quarterman, 537 F.3d 466, 474-75 (5th Cir. 2008).

This Court will first consider petitioner's claim of presumptive bias. Specifically, he claims that Judge Herman was biased against him due to his civil action.[73] On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> Mr. Barker maintains that his naming of a "peer of the court" in his civil lawsuit created a conflict of interest which required the court to recuse itself. He further asserts that once the judge in section 'C' recused himself, every judge in the courthouse should have recused himself or herself, thereby forcing a change of venue.
>
> La. C.Cr.P. art. 671 provides, in pertinent part:
>
> A. In a criminal case a judge of any court, trial or appellate, shall be recused when he:
>
> > (1) Is biased, prejudiced, or personally interested in the cause to such an extent that he would be unable to conduct a fair and impartial trial;
> >
> > (6) Would be unable, for any other reason, to conduct a fair and impartial trial.
>
> We note, at the outset that a "trial judge is presumed to be impartial." State v. Parker, 96-1852, p. 15 (La. App. 4 Cir. 6/18/97), 696 So.2d 599, 607. See also, State v. Stewart, 10-389, p. 8 (La. App. 5 Cir. 5/10/11), 65 So.3d 771, 776 (a "trial judge is presumed to be impartial, and the burden is on the party seeking to recuse a judge to prove otherwise."). "For a defendant to be entitled to the recusation of a trial judge on the grounds of bias or prejudice such must be of a substantial nature based on more than conclusory allegations." Parker, 96-1852, p. 15, 696 So.2d at 607. Thus, the party desiring to recuse the trial judge must set forth factual allegations in support of the motion to rebut the presumption of impartiality. State v. Walton, 469 So.2d 1204, 1205 (La. App. 4 Cir. 1985). Improper remarks or the appearance of impropriety during the proceedings are not cause for recusal unless

---

[73] Rec. Doc. 1-1, pp. 35-37.

supported by evidence in the record of actual bias.  _In re_ Succession of Manheim, 03-0282, p. 8 (La. App. 4 Cir. 10/15/03), 859 So.2d 836, 840.

In this matter, Mr. Barker named the judge in a civil lawsuit based on the appointment of counsel Mr. Barker did not want to accept.  Mr. Barker has pointed to nothing else in the record to overcome the presumption of impartiality.  He asserts that his claimed assignments of error (e.g. the trial court failed to rule on several motions, the court erred in curtailing his voir dire, etc.) established sufficient bias such that recusal was warranted;[FN 32] however, as discussed herein, those assignments of error are meritless and necessarily, he has not shown bias or prejudice of a substantial nature.  Nor do we find that the trial court acted partially when it did not rule in Mr. Barker's favor.  We note, too, that in a per curiam to this Court in response to Mr. Barker's writ application seeking review of this very issue,[FN 33] the district court stated,

> When the defendant attempted the same ploy that had been successful in section C, his motion to recuse this court and his motion for yet another defense attorney were denied.  In denying these requests, this Court concluded that the defendant had not stated a genuine cause of action against either of the sections of court to which his case had been randomly allotted, not [sic] had he a plausible basis for demanding new counsel.  Instead, it was and is the opinion of this court that the defendant is seeking to delay the prosecution of this matter – it has been more than a year since the filing of the bill of information and pretrial motions have not yet been hears [sic] – and is using these spurious complaints and pleadings to that end.

[FN 32]  Mr. Barker asserts that the judge should have recused herself because his lawsuit against her created a conflict of interest.  He uses the alleged assignments of error as evidence of the judge's bias such that recusal was warranted.  Yet, elsewhere in his brief, he asserts that the trial court judge intentionally committed the complained-of "errors" as retribution for naming her in his civil lawsuit.  Summarily, Mr. Barker's _pro se_ supplemental brief, taken as a whole, appears to corroborate the notion that he attempted to fabricate a conflict of interest by suing the judge and his attorney, and then attempted to use that spurious conflict of interest to avoid prosecution (evidenced by his motion to halt prosecution and motions to quash); to avoid conviction (evidenced by his attempts to influence the jury, his motions for recusal, mistrial, etc.); and to avoid incarceration (evidenced by his allegations of bias, revenge, and sabotage – caused by the conflict of interest – as the basis for nearly all of his assignments of error).  The record also indicates indicate [sic] that Mr. Barker sabotaged his own defense to bolster his claim that his rights were violated as a victim of the OPD funding "crisis."  (Mr. Barker filed a _pro se_ motion to dismiss his initial public defender on 8/25/15, just eleven days after he was appointed, claiming the OPD funding crisis precluded his effective representation).

[FN 33]  See footnote 1.

When this Court denied Mr. Barker's writ application, it clearly found no merit to his complaint at the time. In his brief in this appeal, Mr. Barker made assertions similar to those made in his writ application. We do not find, as we did not find with respect to the writ application, that the trial court erred in denying Mr. Barker's motion for recusal or new venue.

We find that this assignment or error is without merit. [74]

The Louisiana Supreme Court thereafter denied petitioner's related writ application without assigning additional reasons.[75]

As noted, the state courts found that petitioner's civil lawsuit was an attempt to manufacture a bias claim – and that is a finding that the record clearly supports. Further, defendants cannot be permitted to unilaterally manufacture conflicts of interest simply by engaging in outrageous behavior directed at the trial judge – allowing such antics to succeed would merely invite "deliberate manipulation of the judicial system." See Bigby v. Dretke, 402 F.3d 551, 560 (5th Cir. 2005). Therefore, defendants who engage behavior in a transparent attempt "to manufacture constitutional due process violations or to delay trial proceedings" are not entitled to a presumption of prejudice. See id. Accordingly, to the extent that petitioner is arguing that the Constitution required that Judge Herman be recused simply because he sued a "peer of the court" is meritless, and that claim should be denied. See, e.g., Montgomery v. Goodwin, No. 2:18-cv-0067, 2018 WL 9597157, at *6-7 (W.D. La. July 11, 2018), adopted, 2018 WL 9597159 (W.D. La. Aug. 27, 2018); Allen v. Cain, Civ. Action No. 11-211, 2013 WL 4499028, at *15-17 (M.D. La. Aug. 20, 2013).

---

[74] State v. Barker, 317 So. 3d 422, 460-62 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.

[75] State v. Barker, 267 So. 3d 85 (La. 2019), reh'g refused, 278 So. 3d 361 (La. 2019); State Rec., Vol. 21 of 21.

Rather, to succeed on his bias claim, petitioner must show "**actual** bias" on the part of Judge Herman.  See Bigby, 402 F.3d at 560.   Here, he attempted to show actual bias by arguing that Judge Herman purportedly improperly attacked his character before the jury.[76]  That argument was premised on comments Judge Herman made during petitioner's pro se opening statement.

Specifically, after Harrell gave an opening statement on his behalf, petitioner was allowed to give his own opening statement to the jury.  As his opening statement was concluding, the following exchange transpired:

> MR. BARKER:
> ....
> So I just, you know, hope that you will pay attention to that and the other thing, I just want to end on a note that I am – Who do I hand this to?
>
> THE COURT:
> I don't know what it is.
>
> MR. BARKER:
> A motion for mistrial.  The mistrial is going to be based on from the day of the –  The motion for mistrial is based on the day from arrest to –
>
> MS. DAWKINS [the prosecutor]:
> Judge, I'll object to –
>
> THE COURT:
> Your objection is sustained.  Motions for mistrial –
>
> MR. BARKER:
> You don't even know what I am doing.
>
> THE COURT:
> Motions for mistrial will be held outside the presence –
>
> MR. BARKER:
> – 516 days and I have never had an attorney ever –
>
> THE COURT:

---

[76] Rec. Doc. 1-1, pp. 30-34.

– of the Jury.

MR. BARKER:

– come and see me.

THE COURT:

Mr. Barker, I am going to advise you at this time that your ability to proceed as hybrid counsel is based on what we have already discussed.  When an objection is lodged, please, give me an opportunity to rule upon it.

Your motion for mistrial is a separate procedure that does not have any bearing on an opening statement where you present to this Jury what you intend to prove during your case or disprove of the State's case.  It is a totally separate argument.  So, please, stick with what you wish to do for opening statements.

MR. BARKER:

Let me just ask this:  I would like to go ahead, if it is okay with my counsel and you, just go ahead and put me in the back because you guys are running this trial by yourself and I don't care –

THE COURT:

Mr. Barker –

MR. BARKER:

You are doing it.

THE COURT:

Mr. Barker, I am going to advise you at this time –

MR. BARKER:

516 days and I haven't had an attorney that has come to visit me.

THE COURT:

Finish your opening statements, please, Mr. Barker.  That is a false statement.  You are not going to mislead the jury.

MR. BARKER:

A false statement?

THE COURT:

Mr. Barker, have a seat, unless you are not finished.

MR. BARKER:

I am saying that under penalty of perjury.

THE COURT:
> Ladies and Gentlemen of the Jury, if you could step into the Jury Room for a moment.

THE DEPUTY:
> All rise for the Jury.

MR. BARKER:
> This is what they don't want you to know.  This is what they don't want you to know.

THE COURT:
> Please be quiet, Mr. Barker, until the Jury has left.

> (The jury exits the courtroom.)[77]

Petitioner argues that Judge Herman's comments that he was making a "false statement" and would not be allowed to "mislead the jury" were improper comments warranting a mistrial, in that they were prejudicial to his ability to mount a defense and were indicative of her bias against him.   On direct appeal, the Louisiana Fourth Circuit Court of Appeal rejected petitioner's allegations, noting:

> Under La. C.Cr.P. art. 770, a mistrial is warranted if, in the presence of the jury, the court, the state, or a court official prejudicially refers to (1) race, religion, color, or national origin; (2) inadmissible other crimes evidence; or (3) the failure of defendant to testify.  However, if the remark does not fall under the scope of art[.] 770, and on motion of defendant, "the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial." La. C.Cr.P. art. 771.   "Mistrial is a drastic remedy which should only be declared upon a clear showing of prejudice by the defendant.  The mere possibility of prejudice is insufficient to warrant a mistrial."  State v. Coleman, 12-1408, p. 12 (La. App. 4 Cir. 1/8/14), 133 So.3d 9, 20 citing State v. Leonard, 05-1382, p. 11 (La. 6/16/06), 932 So.2d 660, 667.
>
> Here, the court's comments to Mr. Barker during his *pro se* opening statement cannot be construed as an opinion on his guilt or innocence, nor on the facts of the case, as no evidence had been presented at that time.  Nor does Mr. Barker make any showing that those comments fall within the scope of La. C.Cr.P. art. 770.  The court informed Mr. Barker that motions for a mistrial must be made

---

[77] State Rec. Vol. 16 of 21, transcript of November 9, 2016, pp. 39-42.

outside the presence of the jury and reminded him of the court's earlier ruling regarding the scope of his comments to the jury.[78]

The Court of Appeal then observed: "[T]he trial court's comments may fairly be characterized as an attempt to maintain control of the courtroom and the trial, while attempting to prevent Mr. Barker from manufacturing a mistrial."[79]  The court further noted:

> Additionally, on its own accord, the court admonished the jury to disregard any impression of guilt or innocence the court may or may not have indicated at any point during trial.  Other than mere suggestion, Mr. Barker has not made a clear showing of prejudice attributable to improper conduct by the court or the State, and any possible prejudice was mitigated by the court when it admonished the jury.[80]

And, ultimately, the Court of Appeal concluded: "We find no merit to this assignment of error."[81]  The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[82]

To the extent that petitioner is arguing that Judge Herman's comments were indicative of actual bias, that argument is unpersuasive.  Petitioner was improperly attempting to prejudice and confuse the jury, and it was necessary for Judge Herman to regain control of the proceedings.  She did not act inappropriately, and her comments were not evidence of bias.  See, e.g., Patterson v. Cain, Civ. Action No. 10-4587, 2011 WL 7962615, at *12 (E.D. La. Oct. 14, 2011) (noting that a trial judge's "flashes of exasperation" are neither uncommon nor evidence of judicial bias), adopted, 2012 WL 1933748 (E.D. La. May 29, 2012). The transcript as a whole reflects that she was extremely patient and accommodating despite petitioner's repeated shenanigans.

---

[78] State v. Barker, 317 So. 3d 422, 455-56 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.
[79] Id. at 456.
[80] Id.
[81] Id.
[82] State v. Barker, 282 So. 3d 224 (La. 2019); State Rec., Vol. 21 of 21.

To the extent that petitioner is further arguing that Judge Herman's comments warranted a mistrial under state law, that is not an issue for this Court. "'[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" Trevino v. Johnson, 168 F.3d 173, 184 (5th Cir. 1999) (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991)). Even if the state courts in fact misapplied state law, that would be of no moment in this proceeding. Federal habeas corpus relief may be granted only to remedy violations of the Constitution and laws of the United States; mere violations of state law will not suffice. 28 U.S.C. § 2254; Engle v. Isaac, 456 U.S. 107, 119 (1983); Thomas v. Ieyoub, No. 93-3757, 1994 WL 286198, at *2 (5th Cir. June 22, 1994) ("[E]rrors of state law, such as a denial of a mistrial, must rise to a constitutional dimension in order to merit habeas relief."); Smith v. Whitley, No. 93-03208, 1994 WL 83777, at *1 (5th Cir. Mar. 3, 1994) ("Even if the court's refusal to declare a mistrial was a violation of Louisiana law, we, as a federal habeas court, are without authority to correct a simple misapplication of state law; we may intervene only to correct errors of constitutional significance.").

Lastly, to the extent that petitioner is arguing that his federal right to a fair trial was violated because Judge Herman's comments might have prejudiced the jurors, that argument fares no better. In a case challenging a judge's comments, the United States Fifth Circuit Court of Appeal explained:

> We have held:
>
> > [O]ur role is to determine whether the judge's behavior was so prejudicial that it denied the defendant a fair, as opposed to a perfect, trial. To rise to the level of a constitutional error, the ... judge's actions, viewed as a whole, must amount to an intervention that could have led the jury to a predisposition of guilt by improperly confusing the functions of judge and prosecutor. The judge's

> intervention in the proceedings must be quantitatively and
> qualitatively substantial to meet this test.
>
> United States v. Bermea, 30 F.3d 1539, 1569 (5th Cir. 1994) (citations omitted).
> Therefore, our review of this issue must focus on matters such as the context of the
> remarks, to whom the remarks were directed, the number and nature of the remarks,
> and the presence of curative instructions.  United States v. Munoz, 150 F.3d 401,
> 414 (5th Cir. 1998).

Evans v. Cockrell, 285 F.3d 370, 376 (5th Cir. 2002).

All of the Evans' factors weigh against petitioner's claim: the context of the remarks was

to make it clear that petitioner's behavior was improper and must cease; the remarks were directed

to petitioner, not the jurors;  the comments were isolated and passing; and the judge ultimately

provided appropriate curative instructions ("If I have given you the impression that I have an

opinion regarding any fact in this case, you are to disregard that impression.  If I have given you

the impression that I have an opinion concerning the guilt or innocence of the defendant, you are

to disregard that impression."[83]).  In light of these considerations, it is clear that the challenged

comments simply were not so egregious as to have adversely affected the fairness of petitioner's

trial.

## E.  Sentencing Claims

Petitioner also asserts multiple claims concerning his sentencing.  Specifically, he claims:

- Louisiana state courts have held that Louisiana law provides that a defendant has a right

    to remain silent in a habitual offender proceeding and that a defendant must be

    expressly advised of that right.  See, e.g., State v. Taylor, 236 So. 3d 1281, 1288 (La.

    App. 5th Cir. 2017) ("La. R.S. 15:529.1(D)(1)(a) provides the court shall inform a

---

[83] State Rec., Vol. 17 of 21, transcript of November 9, 2016, p. 241.

defendant of the allegations contained in the bill of information and of his right to be tried as to the truth thereof according to law. Implicit in this directive is the additional requirement that the defendant be advised of his constitutional right to remain silent."); but see State v. Jones, 35 So. 3d 1162, 1167 (La. App. 5th Cir. 2010) ("Generally, a trial court's failure to advise the defendant of his right to a habitual offender hearing or his right to remain silent is considered harmless error when the defendant's habitual offender status is established by competent evidence offered by the State at a hearing rather than by admission of the defendant."). Petitioner contends that he was not informed of that right.[84]

- For the purposes of Louisiana's habitual offender law, a defendant's predicate convictions include those obtained "under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony." La. Rev. Stat. Ann. § 15:529.1(A). A defendant's sentence will also be affected by whether predicate conviction was "a crime of violence under R.S. 14:2(B)." See, e.g., La. Rev. Stat. Ann. § 15:529.1(A)(3)(b). Petitioner contends that Judge Herman "overstepped her jurisdiction" by "reclassifying" his nonviolent Missouri offenses as "crimes of violence" under Louisiana law.[85]

- Petitioner contends that the state courts erroneously concluded that the multiple bill of information in his case was timely filed under Louisiana law.[86]

---

[84] Rec. Doc. 1-1, pp. 45-46.
[85] Id. at pp. 46-47.
[86] Id. at pp. 48-49.

- Petitioner contends he was not afforded the benefit of amendments to Louisiana's habitual offender law which took effect after his conviction.[87]

- Petitioner contends that, in his habitual offender proceeding, the state failed to meet its burden of proof under La. Rev. Stat. Ann. § 15:529.1(D)(1)(b).[88]

- Petitioner contends that his sentence was excessive because Judge Herman failed to comply with the requirements of La. C. Crim. P. art. 894.1(c).[89]

Petitioner asserted those claims in state court both on direct and collateral review. The claims were consistently and repeatedly denied by the state courts.

For example, on direct review, the Louisiana Fourth Circuit Court of Appeal held:

> Mr. Barker maintains that the State failed to prove beyond a reasonable doubt that he was a habitual offender, arguing that the fingerprints presented at the multiple bill hearing were "not specifically related to any conviction" and the photographs the State submitted were "illegible." He argues that the plea forms containing his date of birth and social security number are insufficient to establish his identity.
>
> At the hearing, the State submitted fingerprints that Officer George Jackson, a fingerprint expert, stated had come from a certified transcript of records from the Missouri Department of Corrections of Mr. Barker's release from custody on probation. The certified transcript of records listed five offenses for which Mr. Barker was convicted in Missouri, including second degree robbery (the conviction associated with the fingerprints), second degree burglary for which he was sentenced on August 13, 2007, and attempted second degree robbery for which he was also sentenced on August 13, 2007. In addition to Mr. Barker's birthdate and social security number, the conviction packet also lists a number of identifiable scars and tattoos.
>
> "To obtain a multiple offender conviction, the State is required to establish both the prior felony conviction and that the defendant is the same person convicted of that felony." State v. Daniels, 00-0850, p.4 (La. App. 4 Cir. 11/8/00), 773 So.2d 229, 231 quoting State v. Henry, 96-1280 (La. App. 4 Cir. 3/11/98), 709 So.2d 322, 326. "[T]he prosecution is not required to use a specific type of evidence to carry its burden at a habitual offender hearing; rather, "prior convictions may be proved

---

[87] Id. at pp. 49-50.
[88] Id. at pp. 50-51.
[89] Id. at p. 51.

by any competent evidence." State v. Ross, 15-1113, p. 9 (La. App. 4 Cir. 12/21/16), 207 So.3d 511, 517, writ denied, 17-0118 (La. 9/22/17), 227 So.3d 823, writ denied, 17-0394 (La. 9/22/17), 227 So.3d 826, and writ denied, 17-0537 (La. 9/22/17), 227 So.3d 827, quoting State v. White, 13-1525, p. 2 (La. 11/8/13), 130 So.3d 298, 300.

Previous decisions by this Court have found that the matching of a defendant's fingerprints to fingerprints on an arrest register, and the linking of that arrest register to other documents evidencing a conviction, suffices to establish that the defendant is the same person previously convicted. State v. Robertson, 05-1214, pp. 4-5 (La. App. 4 Cir. 2/1/06), 925 So.2d 615, 618. See also State v. Francois, 02-2056 (La. App. 4 Cir. 9/14/04), 884 So.2d 658; State v. Wolfe, 99-0389 (La. App. 4 Cir. 4/19/00), 761 So.2d 596; State v. Hawthorne, 580 So.2d 1131 (La. App. 4 Cir.1991).

In State v. Henry, the prosecution was unable to find the arrest register for one of the defendant's prior convictions. This Court held that it was sufficient for the prosecution to produce a certified copy of the prior conviction bearing the same Bureau of Identification Number, physical description, birth date, and social security number of the defendant.

In this case, the State's evidence consisting of a certified transcript of records from the Missouri Department of Corrections which includes a certified fingerprint card positively matched with Mr. Barker's fingerprints, and which contains corresponding and corroborating identifying information as that found in the arrest register of the previous convictions for which Mr. Barker was being charged as a multiple offender, was sufficient for the court to conclude Mr. Barker was the same person convicted for the previous offenses. In this case, the corroborating information consisted of the same DOC number, name, physical description, birthdate and social security number, which the Court has found to be sufficient proof. See also, State v. Vincent, 10-0764, p. 13 (La. App. 4 Cir. 1/19/11), 56 So.3d 408, 416 (the "unique folder number, date of birth, and social security number were sufficient to establish that Vincent was the same defendant .... Based upon the totality of the evidence submitted, the state proved that the defendant was the same Earl Vincent"); State v. Lindsey, 99-3256, p. 7 n.3 (La. 10/17/00), 770 So.2d 339, 345 (where the state introduced the defendant's bill of information packet, which contained docket masters, plea forms, and minute entries, all of which contained the same defendant's birth date, social security number, and Bureau of Identification number, the state "sufficiently proved that the defendant was the person who committed the previous offenses").

We find that this assignment of error has no merit.

….

Mr. Barker contends that that the multiple offender proceeding was untimely. He argues that, although the State noticed its intent to file a multiple offender bill at sentencing, it did not actually file the bill until the day of the hearing. Mr. Barker relies on State v. Muhammad, 03-2991, p. 14 (La. 5/25/04), 875 So.2d 45, 55 for the principle that, although there is no set time frame within which to file

a multiple offender bill, it must be filed within a reasonable time after the State learns a defendant has prior felony convictions.

Under the Habitual Offender Law, La. R.S. 15:529.1:

> If, at any time, either after conviction or sentence, it shall appear that a person convicted of a felony has previously been convicted of a felony under the laws of this state, or has been convicted under the laws of any other state, or of the United States, or of any foreign government or country, of a crime, which, if committed in this state would be a felony, the district attorney of the parish in which subsequent conviction was had may file an information accusing the person of a previous conviction.

La. R.S. 15:529.1 D(1)(a).

The issue of when a multiple offender proceeding is to be instituted is not a novel issue.  In line with Muhammad, this Court has held that "habitual offender proceedings must occur within 'a reasonable time' after the filing of the bill of information."  Ross, 15-1113, p. 13, 207 So.3d at 519.  The Ross Court found no unreasonable delay when four months elapsed between the filing of the multiple bill and the habitual offender proceeding, noting the cases of "[State v.] Toney, 02-0992, p. 7, 842 So.2d [1083,] at 1087 (seventeen-month delay not unreasonable); [and] State v. Grimes, 01-0576, pp. 15-16 (La. App. 4 Cir. 5/2/01), 786 So.2d 876, 885 (sixteen-month delay not prejudicial)."

In State v. Buckley, 11-0369 (La. App. 4 Cir. 12/27/11), 88 So.3d 482, 487, this Court held that a two-year delay between the State's notice of a multiple offender proceeding and the date of the hearing was not unreasonable and did not rise to the level of depriving the defendant a fair hearing, considering the State's assertion that it had not yet received records of the prior convictions and that the hearing had been continued multiple times on both state and defense motions.  The court also noted that the State had notified defendant at his original sentencing that it intended to file a multiple offender bill.

In the instant case, the State noticed its intent to file the multiple offender bill at Mr. Barker's original sentencing hearing on January 6, 2017, and requested additional time to compile the certified conviction packet.  The court set the multiple bill hearing for February 24, 2017.  The record reflects that the hearing was reset for April, 4, 2017; it was then continued on the State's motion, continued again on Mr. Barker's motion, and finally held on July 13, 2017.  Thus, the multiple offender hearing took place approximately six months after the State provided Mr. Barker notice of a multiple offender bill.  We do not find that this delay was prejudicial to Mr. Barker or objectively unreasonable.

Additionally, Mr. Barker did not assert his right to a speedy trial at any time during the proceedings.  In fact, at the outset of the multiple offender hearing, counsel for Mr. Barker requested "an extension of time before this hearing."  Mr.

Barker has not shown that he was prejudiced by the six-month delay between the State's notice and the hearing date.

We find no merit to this assignment of error.

....

Mr. Barker maintains that the trial "[j]udge erred [in] overstepping jurisdiction to reclassify non-violent crimes to [the] status of violent for multiple bill proceeding." He asserts that one of his predicate offenses forming the base of his multiple offender adjudication was not considered a crime of violence under Missouri law, where he was convicted, and the trial court thus erred in interpreting it as a crime of violence under Louisiana law.

At his multiple bill sentencing, Mr. Barker made this very argument to the court. In response, the trial judge correctly explained that under La. R.S. 15:529.1, if an out-of-state, prior offense would be considered a felony were it committed in Louisiana, it may be considered in adjudicating a defendant as a multiple offender.[FN 35] According to La. R.S. 15:529.1(A)(4)(b), the offenses are then evaluated under La. R.S. 14:2(B) to determine if they are considered crimes of violence. (La. R.S. 15:529.1 (A)(4)). Thus, whether the out-of-state offense was defined as a crime of violence in the state in which it occurred is irrelevant. In a Louisiana multiple offender proceeding, Louisiana law is applied to make that determination.

> [FN 35] That statute provides, in pertinent part, that "[a]ny person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, *if committed in this state would be a felony*, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows ...." La. R.S. 15:529.1 (A) (emphasis added).

La. R.S. 15:529.1 (A)(4)(b) provides, in pertinent part:

> If the fourth felony and two of the prior felonies are felonies defined as a crime of violence under R.S. 14:2(B)... or of any other crime punishable by imprisonment for twelve years or more, or any combination of such crimes, the person shall be imprisoned for the remainder of his natural life, without benefit of parole, probation, or suspension of sentence.

"Louisiana law and not the law of the foreign jurisdiction determines the seriousness of the defendant's prior felony convictions." State v. Thomas, 99-1985, pp. 2-3 (La. App. 4 Cir. 1/5/00), 751 So.2d 979, 980, citing State v. Carouthers, 618 So.2d 880 (La. 1993). Furthermore, as this Court explained in State v. Dawson, 99-2489, p. 3 (La. App. 4 Cir. 2/2/00), 752 So.2d 332, 333, citing Carouthers, "the multiple bill statute allows Louisiana's courts to enhance the defendant's sentence on the basis of convictions from another state or under federal law when the

convictions would otherwise be classified as felonies if they were committed in this state."

In <u>Carouthers</u>, the Court found that although one of the defendant's predicate out-of-state offenses did constitute a felony under Louisiana law, the corresponding Louisiana law did not provide a punishment of twelve years or more and therefore the predicate felony could not form the basis of the mandatory life sentence provision for a third felony offender.  In so finding, the court stated,

> When it added subsection A(2)(b) to the multiple offender law in 1977, the legislature provided no clear indication that it had departed from the general rule of Section A using Louisiana law to determine the seriousness of the defendant's prior convictions according to the nature of the conduct charged.

<u>Id.</u>, 618 So.2d at 882.

La. R.S. 15:529.1(A)(4)(B), under which Mr. Barker was sentenced as a fourth felony offender in the instant case, corresponds to the provision for third felony offenders as stated in <u>Carouthers</u>.  Therefore the trial court in the instant case properly applied Louisiana law in determining that two of Mr. Barker's out-of-state predicate offenses, if committed in Louisiana, would have been simple robbery and attempted simple robbery, both considered crimes of violence under La. R.S. 14:2 (B)(23).[FN 36]

[FN 36]  La. R.S. 14:2 (B)(23) provides:

> In this Code, "crime of violence" means an offense that has, as an element, the use, attempted use, or threatened use of physical force against the person or property of another, and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense or an offense that involves the possession or use of a dangerous weapon. The following enumerated offenses and attempts to commit any of them are included as "crimes of violence":

> * * *

> (23) Simple robbery.

This assignment of error has no merit.

….

Mr. Barker next contends that [at] trial the court admitted "known altered fingerprint evidence" to prove his identification in the multiple offender proceeding.  Mr. Barker bases this claim on what he concedes is an incomplete hearing transcript which does not contain either cross-examination or re-direct examination of the fingerprint expert.  During the state's direct examination of Officer George Jackson, a fingerprint expert, it admitted a fingerprint card as State Exhibit 2.  When handed the fingerprint card, Officer Jackson stated, "This is not

the actual one that I compared on because I don't see my handwritten notes, but this is – I don't know who has that copy."

The instant record, however, contains the complete Multiple Offender Hearing transcripts which indicate that the state did, in fact, introduce the actual fingerprint card used by Officer Jackson to make the comparison as indicated by the following colloquy:

> STATE:  Is that the same photocopy I handed you?
>
> WITNESS:  Yes, sir. This is the one I used to do my comparison with earlier in court today.
>
> STATE:  Are your notations located on that?
>
> WITNESS:  Yes. Those are my initials and today's date, yes, sir.

It is, therefore, clear from the record that the State also introduced the actual card used to make the comparison, as Officer Jackson's testimony indicates.

This assignment of error has no merit.

….

In his next assignment of error, Mr. Barker asserts that the court erred in sentencing him under the multiple offender statute that was in effect at the time the fourth felony was committed, and instead, should have sentenced him under the statute which would become effective on November 1, 2017, over two years after the offense occurred and four months after his multiple offender adjudication.  He argues that the cleansing period in the most recent version of the statute is only five years instead of the ten year cleansing period in the version of the statute under which he was sentenced, and that his multiple offender status should reflect accordingly.  We disagree.

It is well-settled that a "defendant should be sentenced in accord with the version of La. R.S. 15:529.1 in effect at the time of the commission of the charged offense."  State v. Parker, 03-0924, p. 16 (La. 4/14/04), 871 So.2d 317, 326.  (See also, State ex rel. Nicholas v. State, 15-1060, p. 3, n. 3 (La. 4/22/16), 192 So.3d 729, 731 recognizing the well-settled rule that a "defendant's status as a habitual offender is ... determined as of the date that he commits the charged crime.").  In Parker, the Supreme Court discussed the public policy behind the issue of ameliorative changes in habitual offender law as asserted in State v. Dreaux, 205 La. 387, 17 So.2d 559 (1944):

> We went on to note that if we were to find a defendant's status as a second offender was fixed as of any date other than the commission of the offense, "it would be within the power of the district attorneys and the Attorney General, by delaying the filing of the charges and prosecution of the case, to fix the accused's status as a second

offender at practically any time he desired." [Dreaux] at 392, 17 So.2d at 560. Thus, we also found public policy dictated that defendant's habitual offender status be fixed as of the date of the commission of the crime since this allows defendant's own act to establish his status rather than leaving the matter in the discretion of government attorneys.

\* \* \*

Following Dreaux, this court has consistently held that habitual offender proceedings do not charge a separate crime but merely constitute ancillary sentencing proceedings such that the punishment for a new conviction is enhanced. See State v. Dorthey, 623 So.2d 1276, 1278-79 (La. 1993); State v. Walker, 416 So.2d 534, 536 (La. 1982); State v. Williams, 326 So.2d 815, 818 (La. 1976). Additionally, it is generally settled that the law in effect at the time of the commission of the offense is determinative of the penalty which is to be imposed upon the convicted accused. See State v. Narcisse, 426 So.2d 118, 130 (La. 1983). State v. Wright, 384 So.2d 399, 401 (La. 1980); State v. Gros, 205 La. 935, 938, 18 So.2d 507, 507 (1944), cert. denied, 326 U.S. 766, 66 S.Ct. 170, 90 L.Ed. 462 (1945). Finally, "[t]he mere fact that a statute may be subsequently amended, after the commission of the crime, so as to modify or lessen the possible penalty to be imposed, does not extinguish liability for the offense committed under the former statute." Narcisse, 426 So.2d at 130.

Parker, 03-0924, pp. 7-10, 871 So.2d at 321-22.

In the instant case, Mr. Barker committed the felonies underlying his habitual offender status in 2015 and was sentenced as a habitual offender under the law in effect at the time of the commission of the offenses.

This assignment of error has no merit.[90]

The Louisiana Supreme Court thereafter denied petitioner's related writ application without assigning additional reasons.[91]

---

[90] State v. Barker, 317 So. 3d 422, 456-58 and 64-67 (La. App. 4th Cir. 2018); State Rec., Vol. 21 of 21.
[91] State v. Barker, 267 So. 3d 85 (La. 2019), reh'g refused, 278 So. 3d 361 (La. 2019); State Rec., Vol. 21 of 21.

Then, on collateral review, petitioner filed his "Motion for Correction of Premature, Infirm and Invalid Multiple Offender Sentence Based on Application of New Louisiana Supreme Court Ruling," which the state district court denied, holding:

> This matter comes before the Court on a "Motion for Correction of Premature, Infirm and Invalid Multiple Offender Sentence Based on Application of New Louisiana Supreme Court Ruling." In this filing, the defendant correctly reports that the Louisiana Supreme Court recently ruled that the recent changes to La. R.S. 15:529.1 are to be applied to any case in which the conviction was not final on the effective date of Act 282, i.e. November 1, 2017. State v. Damion Williams, No. 2017-K-1753 (La. 6/15/18). However, for the reasons discussed below, those changes do not avail Mr. Barker and his motion is therefore DENIED.
>
> A contradictory hearing was held on July 13, 2017 on the multiple bill and Mr. Barker was adjudicated a fourth felony offender. The court then sentenced Barker to life imprisonment at hard labor with no benefit of parole, probation, or suspended sentence on both counts of simple burglary (counts 1 and 4), and to twenty years imprisonment at hard labor with no benefit of parole, probation, or suspended sentence on the remaining felony counts of simple criminal damage to property, attempted simple burglary of an inhabited dwelling, and both counts of theft (Counts 3, 5, 6, and 9).
>
> In his motion the defendant cites the recent change in the Habitual Offender statute that changes the cleansing period from 10 years to five years. He is also right that his conviction was not final until May 30, 2018, when the Fourth Circuit affirmed his convictions and sentences. See State v. Barker, 2017-0469 (La.App. 4 Cir. 5/30/18). The flaw in Mr. Barker's logic is that he contends that the reduced cleansing period applies to his multiple bill proceeding; it does not.
>
> Paragraph C of §529.1 provides that a predicate conviction is unavailable "if more than ten years have elapsed between the date of the commission of the current offense or offenses and the expiration of correctional supervision, or term of imprisonment if the offender is not placed on supervision following imprisonment, for a crime of violence as defined in R.S. 14:2(B)." The date of commission of the crime for which Mr. Barker was multiple-billed was June 14, 2015. The most recent predicate felony alleged in the multiple bill for Mr. Barker was an attempted second degree robbery in Missouri for which Barker was sentenced to a term of imprisonment of seven years on August 13, 2007. Clearly, if the attempted second degree robbery is a "crime of violence," as the term is contemplated in 14:2(B), then the cleansing period applicable to Barker is 10 years and not five, and the fourth offender adjudication is valid.
>
> As stated above, Barker pled guilty to attempted second degree robbery. Pursuant to Missouri Criminal Statute § 570.025, "[A] person commits the offense of robbery in the second degree if he or she forcibly steals property and in the course thereof causes physical injury to another person." According to La. R.S.(B), "crime

of violence" means an offense, that has, as an  element, the use, attempted use, or threatened use of physical force against the person or property of another, and that, by its very nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense or an offense that involves the possession or use of a dangerous weapon.  In this Court's opinion, the offense created by § 570.025 is a crime of violence as that term was contemplated by the Louisiana Legislature in enacting both of the above excerpted statutes.

Further, even if Barker's contention that this attempted second degree robbery is not a crime of violence was correct, he still would get no relief from the new version of Paragraph C of §529.1.  The records introduced into evidence by the prosecution at the multiple bill hearing reflect that, as to the attempted second degree robbery conviction, Barker was released from the supervision of the Missouri Department of Corrections on August 13, 2010.[FN 1] So, any felony, even a non-violent one, he committed in Louisiana before August 14, 2015 would be available for multiple bill purposes.  As indicated above, Barker committed the instant offense on June 14, 2015, within the five year period.  Accordingly, his assignments are without merit.

> [FN 1]  There is also reference in the records that Barker would not be released from supervision until November 19, 2013.  However, as Barker's argument fails under either scenario, this Court will use the earlier date.[92]

The Louisiana Fourth Circuit Court of Appeal then denied petitioner's related writ application, holding:

> Relator appeals the ruling of the district court denying his Motion for Correction of Premature, Infirm, and Invalid Multiple Offender Sentence Based on Application of New Louisiana Supreme Court Ruling.  We find no error in the district court's ruling.
>
> Following a spree of break-ins which occurred in June of 2015, a jury convicted relator of multiple felonies (including two counts of simple burglary).  The court adjudicated relator a fourth felony offender and sentenced him as a recidivist to life imprisonment on the burglary counts on July 13, 2017.  This Court recently affirmed the convictions and sentences.  State v. Barker, 2017-0469 (La. App. 4th Cir. 5/30/18), ___ So.3d ___ (reh'g denied 6/21/18).  Writs remain pending in the Louisiana Supreme Court.
>
> Relator subsequently filed the *pro se* pleading referenced above.  The district court denied relief in a written judgment of July 13, 2018.  Relator now seeks review in this Court.  In his writ application relator claims that he is entitled to the benefit of ameliorative sentencing legislation as his most-recent conviction did not become final until after the amendment to La. R.S. 15:529.1 became

---

[92] State Rec., Vol. 21 of 21, Judgment dated July 13, 2018.

effective and that under the reduced cleansing period he should not have been
adjudicated as a recidivist.

   Although the ameliorative legislation reduces the cleansing period in some
cases from ten to five years, and relator initially appeared to be eligible to be
sentenced under the new law because his conviction was not final before the [sic]
November 1, 2017, the effective date of the amendment, the district court
recognized that relator's most-recent conviction was a 2007 offense for attempted
second degree robbery in Missouri, qualifies as a crime of violence and thus relator
would still be subject to the ten-year cleansing period.  See R.S. 15:529.1(C)(2)
(ten-year cleansing period applicable if predicate is a crime of violence).  State v.
Barker, 2017-0469, p. 62.

   Moreover, the district court judgment reveals that he would not have been
released from state supervision until November of 2013.  That being the case,
relator's most-recent offenses fell well within the ten year cleansing period and
the district court did not err when adjudicating him a fourth felony offender.  Therefore
the life sentences imposed were not rendered illegal by ameliorative sentencing
legislation. See La. R.S. 15:529.1(A)(4)(a) (fourth felony offender with at least one
conviction for crime of violence eligible for sentence of between 20 years and life
imprisonment).[93]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning

additional reasons.[94]

   In its response in this federal proceeding, the state asserts a variety of defenses with respect

to these sentencing claims.

   First, the state argues that the foregoing sentencing claims are not cognizable in this federal

proceeding because they are premised on errors of state law, not federal constitutional violations.[95]

It is true that a petitioner asserting claims based on mere state-law errors cannot be granted relief

on those claims in federal court.  Rather, as already repeatedly noted herein, issues of state law are

left to the state courts.  Because a federal court does "not sit as a 'super' state supreme court," this

---

[93] State v. Barker, No. 2019-K-0027 (La. App. 4th Cir. February 11, 2019) (footnote omitted); State Rec., Vol. 21 of 21.

[94] State v. Barker, 282 So. 3d 224 (La. 2019); State Rec., Vol. 21 of 21.

[95] Rec. Doc. 24, pp. 4-11.

Court simply lacks authority to "review a state court's interpretation of its own law in a federal habeas corpus proceeding." Dickerson v. Guste, 932 F.2d 1142, 1145 (5th Cir. 1991).

Second, the state again raises the interrelated defenses of exhaustion and procedural default. The general exhaustion requirement has already been discussed *supra* in connection with petitioner's claims challenging the sufficiency of the evidence, and, therefore, it need not be repeated. Rather, only one new wrinkle requires further explanation.

Specifically, the state's exhaustion defense concerning the sufficiency claims was based on the fact that petitioner failed to raise certain of those claims **at all** in the state courts. The exhaustion defense with respect to the sentencing claims is not based on a complete failure to assert the sentencing claims – on the contrary, as evident from the foregoing discussion, petitioner raised such claims ad nauseam in the state courts. Rather, the state's exhaustion defense here is premised on the fact that these sentencing claims were presented to the state courts as violations of **state** law. Because, as already explained, state law claims are not reviewable in a habeas proceeding, petitioner is entitled to review of his sentencing claims in this Court only if they are premised on violations of **federal** law.

But even then, such review is available only if the claims were exhausted – and, specifically, exhausted **as federal claims**. As the United States Supreme Court has explained:

> In Picard v. Connor, 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971), we said that exhaustion of state remedies requires that petitioners "fairly presen[t]" federal claims to the state courts in order to give the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights" (some internal quotation marks omitted). If state courts are to be given the opportunity to correct alleged violations of prisoners' federal rights, **they must surely be alerted to the fact that the prisoners are asserting claims under the United States Constitution**.

Duncan v. Henry, 513 U.S. 364, 365-66 (1995) (emphasis added); accord Baldwin v. Reese, 541 U.S. 27, 29 (2004) ("To provide the State with the necessary 'opportunity,' the prisoner must 'fairly present' his claim in each appropriate state court (including a state supreme court with powers of discretionary review), thereby alerting that court to the **federal nature** of the claim." (emphasis added)); Lucio v. Lumpkin, 987 F.3d 451, 464 (5th Cir. 2021) ("[The exhaustion doctrine is] premised on comity and federalism:  Because state courts are obligated to enforce federal law, they must be given the first chance – after the state prisoner fully explains **the federal claim** – to correct any error." (emphasis added)), cert. denied, 142 S. Ct. 404 (2021); Neville v. Dretke, 423 F.3d 474, 479 (5th Cir. 2005) ("[T]he Supreme Court has found that not only must a petitioner present the state court with his claim, but he must also alert the state court of **the constitutional nature** of the claims." (emphasis added)).

The mere fact that a petitioner exhausted a state claim is insufficient to constitute exhaustion of a distinct (albeit similar) federal claim that was not asserted in the state courts. Henry, 513 U.S. at 366; Anderson v. Harless, 459 U.S. 4, 6 (1982) ("28 U.S.C. § 2254 requires a federal habeas petitioner to provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim.  It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." (citations omitted)); Canales v. Stephens, 765 F.3d 551, 577 (5th Cir. 2014) ("Vague or fleeting references to principles of constitutional law are not enough, nor will the fact that the petitioner made a 'somewhat similar state-law claim' suffice." (citations omitted)).  In other words, a petitioner cannot open the door to the federal courthouse simply by repackaging an exhausted state-law claim as a federal claim.  See Lucio, 987 F.3d at 464 ("Obviously, it would

undermine or eliminate the exhaustion requirement if a state prisoner could change the claim along the way from state court to federal court.") and 482 ("[United States Supreme Court cases] squarely foreclose [a petitioner] from arguing one thing in state court and another broader thing in federal court.").

Here, the Court agrees that these sentencing claims were asserted in the state courts only as violations of state law. Therefore, as the state correctly argues, no federal aspects (if any) have been exhausted.

And as was also already explained *supra*, unexhausted claims are procedurally barred in federal court if they would also be procedurally barred in the state courts if the petitioner tried to assert them there. Nobles v. Johnson, 127 F.3d 409, 420 (5th Cir. 1997). Again, that is true here, in that the Louisiana Supreme Court has already advised petitioner that "unless he can show that one of the narrow exceptions authorizing the filing of a successive application applies, [he] has exhausted his right to state collateral review."[96]

Therefore, as before, petitioner is entitled to federal review of the claims only by showing either that (1) both "cause" exists for his default and "prejudice" would result from the application of the procedural bar or (2) the Court's failure to address his claims would result in a "fundamental miscarriage of justice." See, e.g., Bagwell v. Dretke, 372 F.3d 748, 756-57 (5th Cir. 2004). He has made neither showing.

Petitioner makes no attempt to establish "cause" for failing to assert these sentencing claims in the state courts as violations of federal constitutional law. And, in that he has not

---

[96] State v. Barker, 324 So. 3d 83 (La. 2021), reh'g refused, 328 So. 3d 78 (La. 2021); State Rec., Vol. 21 of 21.

established "cause," the Court need not consider whether any prejudice resulted.  <u>Martin v. Maxey</u>, 98 F.3d 844, 849 (5th Cir. 1996).

As to the "fundamental miscarriage of justice" exception, it is not clear that exception even applies to defaulted claims concerning noncapital sentencing errors.  In 2004, the United States Supreme Court noted that there was "a growing divergence of opinion in the Courts of Appeals regarding the availability and scope of the actual innocence exception in the noncapital sentencing context."  <u>Dretke v. Haley</u>, 541 U.S. 386, 392 (2004).  However, the Supreme Court declined to resolve that issue in <u>Haley</u>, and some eighteen years later the issue remains unresolved.  <u>See</u> Brian R. Means, Federal Habeas Manual § 9B:78 (2022).

Nevertheless, even if the exception is available, it would require that petitioner "show that but for the constitutional error **he would not have been legally eligible for the sentence he received**."  <u>Sones v. Hargett</u>, 61 F.3d 410, 418 (5th Cir. 1995) (emphasis added); <u>see</u> <u>Holmes v. Vannoy</u>, Civ. Action No. 16-6894, 2018 WL 941712, at *19 (E.D. La. Jan. 11, 2018), <u>adopted</u>, 2018 WL 929602 (E.D. La. Feb. 16, 2018).  However, as the Louisiana state courts correctly noted, petitioner has not made that showing in the instant case.

<u>**RECOMMENDATION**</u>

It is therefore **RECOMMENDED** that the federal application seeking habeas corpus relief filed by Samuel Barker be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by

the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  28 U.S.C. § 636(b)(1); <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[97]

New Orleans, Louisiana, this <u>12th</u> day of September, 2022.


_____
**DANA M. DOUGLAS**
**UNITED STATES MAGISTRATE JUDGE**

---

[97] <u>Douglass</u> referenced the previously applicable ten-day period for the filing of objections.  Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.